No. 23-1010

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

United States of America,

*Plaintiff-Appellee*,

vs.

Deny Mitrovich,

*Defendant-Appellant.*

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 18-CR-789
The Honorable Gary S. Feinerman

# OPENING BRIEF AND REQUIRED APPENDIX FOR
# DEFENDANT-APPELLANT DENY MITROVICH

Vadim A. Glozman
Matthew P. Kralovec
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
P: (312)-726-9015
*Counsel for Deny Mitrovich*

**Oral Argument Requested**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1010
Short Caption: United States v. Deny Mitrovich

The full name of every party that the attorney represents in this case:

Deny Mitrovich

The names of all law firms who partners of associates have appeared for the party in this case (including the proceedings in the district court or before an administrative agency) or are expected to appear for the party in this Court:

*District Court Proceedings*:                    *Appeal*:

Law Offices of Barry M. Lewis              Law Offices of Vadim A. Glozman

Law Offices of Vadim A. Glozman

Date: **May 1, 2023**                    /s Vadim A. Glozman
                                          Vadim A. Glozman

                                          /s Matthew P. Kralovec
                                          Matthew P. Kralovec

                                          LAW OFFICES OF VADIM A. GLOZMAN
                                          53 W. Jackson Blvd., Suite 1128
                                          Chicago, IL 60604
                                          P: (312)-726-9015
                                          F: (312)-276-8040

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ............................................................. v

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ......................................................... 2

INTRODUCTION .................................................................... 3

STATEMENT OF THE CASE ........................................................... 5

    I.     Watering Hole Investigations ........................................... 5

    II.    The FBI Unmasks "The Love Zone" and Launches an International
          Investigation ........................................................ 6

    III.   The Identifying Technique ............................................. 8

    IV.   Compelling Discovery: The District Court Finds Prima Facie Evidence
          that the Joint Investigation Conducted a Fourth Amendment Search ......... 9

    V.    The Government's Disclosure Suggests That Code Was Uploaded to
          Computers But Fails to Explain How the Technique Unmasked Users ....... 11

    VI.   The District Court Excuses the Government's Failure to Explain How
          the Identifying Technique Operated ..................................... 13

SUMMARY OF THE ARGUMENT ........................................................ 15

ARGUMENT ....................................................................... 16

    I.     The District Court Erred by Excusing the Government's Failure to
          Produce the Technique's Source Code or Technical Details Explaining
          How It Identified Mr. Mitrovich's Computer ............................. 16

          A.    Standard of review .................................................. 16

B.   Mr. Mitrovich was entitled to the material because he made a prima facia showing that the joint investigation conducted a Fourth Amendment search to identify his computer ...................... 17

C.   The Government's duty under Rule 16 extends to all agencies taking part in the joint investigation ............................................... 19

D.   The Government's good-faith effort does not excuse their inability to produce the material because they were imputed with constructive possession .......................................................... 22

E.   The evidence derived from the identifying technique should have been suppressed because it was the least severe sanction to cure the prejudice caused by being denied the technical details ............ 26

II.   Mr. Mitrovich's *Brady* Rights Were Violated Because He Could Not Present a Meaningful Fourth Amendment Challenge ................................ 28

A.   Standard of review ......................................................................... 29

B.   Mr. Mitrovich sought the technical details under *Brady* to develop a Fourth Amendment motion to suppress .......................... 30

C.   The *Brady* rule extends to material needed to contest unconstitutional searches .............................................................. 31

D.   The technical details were favorable because the evidence suggested that the identifying technique conducted a search just like other government malware ............................................... 33

E.   There was a reasonable probability that the evidence would have been suppressed because the agents needed a warrant to conduct searches on American soil and the search was conducted unreasonably ................................................................ 34

F.   The evidence should have been suppressed or the indictment dismissed under the court's supervisory powers because the agents acted with a reckless disregard for Mr. Mitrovich's ability to prepare a defense .......................................................... 38

CONCLUSION ........................................................................................... 42

RULE 32 CERTIFICATE OF COMPLIANCE ................................................................ 43

CERTIFICATE OF SERVICE ...................................................................................... 44

RULE 30(D) CERTIFICATE OF COMPLIANCE ........................................................ 45

REQUIRED SHORT APPENDIX TABLE OF CONTENTS ........................................... 47

# TABLE OF AUTHORITIES

**Cases**

*Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009) ...................................................... 21

*Biles v. United States*, 101 A.3d 1012 (D.C. 2014) .......................................................... 31

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................... passim

*Brigham City v. Stuart*, 547 U.S. 398 (2006)..........................................................35, 36

*Carey v. Duckworth*, 738 F.2d 875 (7th Cir. 1984)........................................................ 20

*Elkins v. United States*, 364 U.S. 206 (1960) ..........................................................38, 39

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012)......................................................20, 21

*Franks v. Delaware*, 438 U.S. 154 (1978) ....................................................................... 32

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019) ....................................................... 34

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008) ........ 35

*Kyles v. Whitley*, 514 U.S. 419 (1995)............................................................................. 29

*Kyllo v. United States*, 533 U.S. 27 (2001) ..................................................................... 36

*Lange v. California*, 141 S. Ct. 2011 (2021)................................................................... 35

*Mapp v Ohio*, 367 U.S. 643 (1961).................................................................................. 32

*McCormick v. Parker*, 821 F.3d 1240 (10th Cir. 2016) .................................................. 21

*Ross v. Blake*, 578 U.S. 632 (2016) ................................................................................ 23

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990) ................................................................ 31

*United States v. Alvarez*, 987 F.2d 77 (1st Cir. 1993) ................................................... 27

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)................................................. 20

*United States v. Anzalona*, 221 F. Supp. 3d 189 (D. Mass. 2016) ................................... 37

*United States v. Ashley*, 54 F.3d 311 (7th Cir. 1995) ......................................................... 29

*United States v. Barton*, 995 F.2d 931 (9th Cir. 1993) ............................................. 31, 32

*United States v. Bases*, 549 F. Supp. 3d 822 (N.D. Ill. 2021) .................................... 19, 20

*United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989) ...................................................... 23

*United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012) ................................................. 19

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ................................. 39, 40, 41

*United States v. Callahan*, 534 F.2d 763 (7th Cir. 1976) ................................................. 24

*United States v. Camargo-Vergara*, 57 F.3d 993 (11th Cir. 1995) ............................ 27, 28

*United States v. Chaparro-Alcantara*, 226 F.3d 616 (7th Cir. 2000) ............................. 16

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) ............................................. 39

*United States v. Chin.* 934 F.2d 393 (2d Cir. 1991) ........................................................... 37

*United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980) ......................................... 32, 39

*United States v. Cotroni*, 527 F.2 708 (2d Cir. 1975) ...................................................... 24

*United States v. Darby*, 190 F. Supp. 3d 520 (E.D. Va. 2016) ......................................... 18

*United States v. Eldred*, 933 F.3d 110 (2d Cir. 2019) .......................................................... 6

*United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013) ...................................................... 32

*United States v. Gamez-Orduno*, 235 F.3d 453 (9th Cir. 2000) ................... 28, 29, 31, 34

*United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) ......................................................... 24

*United States v. Gray*, 648 F.3d 562 (7th Cir. 2011) ................................................. 19, 21

*United States v. Grisanti*, 943 F.3d 1044 (7th Cir. 2019) ............................................... 18

*United States v. Hammond*, 263 F. Supp. 3d 826 (N.D. Cal. 2016)................................. 33

*United States v. Harris*, 542 F.2d 1283 (7th Cir. 1976) ............................................ 23, 24

*United States v. Henderson*, 906 F.3d 1109 (9th Cir. 2018)...................................... 33, 35

*United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017)............................................ 18, 35

*United States v. Hyder*, 732 F.2d 841 (11th Cir. 1984) .................................................... 39

*United States v. Johnathan Thomas*, 726 F.3d 1086 (9th Cir. 2013)........................ 34, 38

*United States v. Kienast*, 907 F.3d 522 (7th Cir. 2018) .................................. 5, 18, 33, 35

*United States v. Knowles*, 207 F. Supp. 3d 585 (D.S.C. 2016)......................................... 33

*United States v. Laurent*, 607 F.3d 895 (1st Cir. 2010) ................................................... 29

*United States v. Lawrence*, 788 F.3d 234 (7th Cir. 2015)................................................ 27

*United States v. Lee*, 723 F.3d 134 (2d Cir. 2013)...................................................... 22, 24

*United States v. Libby*, 429 F. Supp. 2d 1 (D.D.C. 2006) ................................................ 19

*United States v. Lorefice*, 192 F.2d 647 (7th Cir. 1999) .................................................. 41

*United States v. Lyons*, 352 F. Supp. 2d 1231 (M.D. Fla. 2004) ..................................... 39

*United States v. Mackin*, 793 F.3d 703 (7th Cir. 2015).................................................... 27

*United States v. McLellan*, 959 F.3d 442 (1st Cir. 2020) ........................................... 40, 41

*United States v. Melvin*, 948 F.3d 848 (7th Cir. 2020) .................................................... 16

*United States v. Morris*, 80 F.3d at 1151 (7th Cir. 1996)........................................... 21, 26

*United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976) .................................................. 25

*United States v. Mota*, 685 F.3d 644 (7th Cir. 2012) ................................................. 21, 28

*United States v. Owens*, 18 F.4th 928 (7th Cir. 2021)............................................... passim

*United States v. Paternina-Vergara*, 749 F.2d 993 (2d Cir. 1984) ..................... 22, 24, 25

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) .................................................. 25

*United States v. Polizzi*, 801 F.2d 1543 (9th Cir. 1986) ................................................... 23

*United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006) ..................................................... 20

*United States v. Soto-Zuniga*, 837 F.3d 992 (9th Cir. 2016) ........................................... 17

*United States v. Steurer*, 942 F. Supp. 1183 (N.D. Ill. 1996) ........................................... 23

*United States v. Stever*, 603 F.3d 747 (9th Cir. 2010) .................................................... 23

*United States v. Stokes*, 726 F.3d 880 (7th Cir. 2013) ................................. 25, 26, 35, 36

*United States v. Taylor*, 250 F. Supp. 3d 1215 (N.D. Ala. 2017) .................................... 36

*United States v. Taylor*, 935 F.3d 1279 (11th Cir. 2019)...................................... 5, 18, 35

*United States v. Thomas*, 835 F.3d 730 (7th Cir. 2016) ..................................... 29, 31, 34

*United States v. Valdivia*, 680 F.3d 33 (1st Cir. 2012) ................................................... 25

*United States v. Vinas*, 910 F.3d 52 (2d Cir. 2018).............................................. 17, 27, 28

*United States v. Warren*, 454 F.3d 752 (7th Cir. 2006).................................................. 26

*United States v. Werdene*, 883 F.3d 204 (3rd Cir. 2018)................................................. 34

*United States v. White*, 489 F. Supp. 3d 274 (S.D.N.Y. 2020) .................................. 31, 32

*United States v. Wilson*, 237 F.3d 827 (7th Cir. 2001)................................................... 21

*United States v. Young*, 20 F.3d 758 (7th Cir. 1994) ...................................................... 31

*Weeks v. United States*, 232 U.S. 383 (1914)................................................................. 32

**Statutes and Rules**

18 U.S.C. § 2252A ........................................................................................................... 1

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3500 ........................................................................ 22, 23, 24

18 U.S.C. § 3742 ...................................................................................... 1

28 U.S.C. §1291 ...................................................................................... 1

Fed. R. Crim. P. 16 ........................................................................... passim

Fed. R. Crim. P. 16, Advisory Committee's Note (1974) ................................. 24

Fed. R. Crim. P. 41 ............................................................................... 35

**Other Authorities**

Jamie Tarabay, *Myanmar Citizens Use Protester Toolkit to Skirt Internet Ban*,
    Bloomberg, (Mar. 24, 2021) ............................................................... 9

Jonathan Mayer, *Government Hacking*,
    127 Yale L. J. 570 (2017) ............................................................. 17, 18

Kevin Poulsen, *FBI Admits It Controlled Servers Behind Mass Malware Attack*,
    Wired, (Sept. 13, 2013, 4:17 PM) ...................................................... 5

Tor Project, *Users of Tor*, (archived Nov. 1, 2014) ............................................. 9

## JURISDICTIONAL STATEMENT

A grand jury indicted Defendant-Appellant Deny Mitrovich with one count of possessing child pornography, violating 18 U.S.C. § 2252A(a)(5)(B). R. 1.[1] Because he was charged with an offense against the United States, the Northern District of Illinois had jurisdiction under 18 U.S.C. § 3231. After the district court declined to impose sanctions for a discovery dispute, he pled guilty to the one count, preserving the right to appeal the order. R. 129, 130. On December 19, 2022, the district court sentenced him to 84 months imprisonment, entering the judgment that same day. RSA:1; R. 152, 153. On January 4, 2023, Defendant-Appellant Deny Mitrovich filed his timely notice of appeal. R. 154. This Court has jurisdiction under 28 U.S.C. §1291, which provides jurisdiction over a final judgment from a United States District Court, and 18 U.S.C. § 3742(a), which provides jurisdiction for reviewing a criminal sentence.

---

[1] The District Court's docket entries are cited as "R.," the Required Appendix is cited as "RSA," and the February 24, 2020, hearing is cited as "Hr. Tr."

## STATEMENT OF THE ISSUES

1. Federal Rule of Criminal Procedure 16 entitles defendants to discovery if they make a prima facia showing that it is material to their defense. The district court found that Mr. Mitrovich made that showing, entitling him to the technical details about a program that American and Oceanian agents used to identify him during a joint venture. Could the district court adopt the Second Circuit's good-faith rule, which applied to the Jencks Act, to excuse the government's noncompliance?

2. The *Brady* rule entitles defendants to favorable evidence that has a fair probability of affecting the proceedings' outcome. The evidence suggested that the withheld technical details would show that the program trespassed into Mr. Mitrovich's computer, forcing it to act. Could the district court find that the technical details were not material even though they likely showed that the joint venture conducted a warrantless search on American soil?

## INTRODUCTION

This case stems from an international joint investigation into a dark net website. FBI agents collaborated with foreign law enforcement to identify hidden websites on the Tor network and unmask their users. To accomplish this, authorities use identifying techniques to covertly infect users' computers, compelling them to reveal their true identities. These techniques conducted Fourth Amendment searches. At the core of this case is one such identifying technique. Deny Mitrovich, an American citizen living in the United States, likely had his personal computer invaded by this identifying technique. No warrant authorized this tactic.

Throughout 2014, the FBI worked with law enforcement agents in Australia and New Zealand to investigate an illicit website called The Love Zone. During the investigation, Oceanian authorities used an identifying technique that ultimately linked Mr. Mitrovich to the website. The FBI knew that the Oceanian authorities were planning to use the technique and were even provided with a technical overview months before.

This appeal is about how that identifying technique operated. Mr. Mitrovich believed that this identifying technique operated just like other identifying techniques: it invaded his computer and forced it to act. Put simply, it committed a Fourth Amendment search. And because the FBI was in a joint venture with Oceanian authorities, the fruits should have been suppressed under the Fourth Amendment. Mr. Mitrovich sought discovery to prove his theory correct. At first, the district court agreed, ordering that the government must produce documents about: 1) its cooperation with Oceanian authorities; and 2) how the technique operated. But when the government failed to produce any

documents explaining how it functioned, the district court excused the government's noncompliance because it had made a good-faith effort to obtain the material from foreign authorities. This was wrong.

*First*, the district court mistakenly crafted a new rule to excuse Rule 16 violations premised on conflicting law from the Second Circuit. *Second*, the *Brady* rule required the government to produce the technical details because the Oceanian authorities were part of the prosecution team. All the evidence suggested that the technique invaded Mr. Mitrovich's computer. Armed with the technical details, there was a reasonable probability that the evidence obtained from this warrantless search—conducted on American soil—would have been suppressed. *Third*, the only cure to being denied the technical details was to suppress the evidence or dismiss the indictment. No less severe remedy was adequate.

This is not a case about foreign law enforcement merely sharing information with America. Instead, this case is about American agents being intimately involved in a joint investigation that resulted in warrantless searches on American soil. The agents here knew that technical details were vital to criminal cases. Yet it failed to obtain the information, reaping the benefits of warrantless searches. This Court must reverse the district court's order.

## STATEMENT OF THE CASE

### I.    Watering Hole Investigations

In today's world, many websites that offer illegal goods or services are hosted on the Tor network. RSA:24-25; R. 73 at 1-2; *see also United States v. Kienast*, 907 F.3d 522, 526 (7th Cir. 2018). Tor allows users and websites to "remain anonymous or untraceable." *United States v. Taylor*, 935 F.3d 1279, 1282 (11th Cir. 2019). Tor accomplishes this by encrypting web traffic and routing it through a network of servers. RSA:24-25; R. 73 at 1-2. To reach these websites, also known as "hidden services," users must use special software called Tor clients. RSA:24-25; R. 73 at 1-2. For instance, they can use the Tor browser which offers features to protect users' privacy. RSA:25; R. 73 at 2; R. 56 at 4-5 n.3. Together, the Tor network and browser mask users' true IP addresses and conceal other identifying information normally exposed while surfing the internet. RSA:24-25; R. 73 at 1-2

The Government eventually discovered programs and techniques to unmask Tor users' true identities and locate hidden services. In one widely publicized case, the FBI used secret programs to topple the illicit hidden service, Freedom Hosting. R. 96 at 3; R. 56 at 5 n.4. There, agents employed a watering hole operation which infected users' computers with a piece of malware.[2] The operation worked like this: FBI agents located

---

[2] Kevin Poulsen, *FBI Admits It Controlled Servers Behind Mass Malware Attack*, Wired, (Sept. 13, 2013, 4:17 PM),  https://perma.cc/9LRE-JPH3 (describing the Freedom Hosting Investigation and that the FBI's malware sent forced computers to send "identifying information through the open internet[.]")

5

and seized servers hosting the illicit sites, and then infected the servers with a program. *United States v. Eldred*, 933 F.3d 110, 115-16 (2d Cir. 2019). So like a poisoned watering hole, when users visited the sites, they unknowingly downloaded the malware. The program forced users' computers to bypass the Tor network, exposing their true IP address and a unique identifier to a government-controlled server. *Id.*

## II.     The FBI Unmasks "The Love Zone" and Launches an International Investigation

After taking down the Freedom Hosting servers, the FBI turned its sights to two other Tor websites, The Love Zone ("TLZ") and 7axxn. R. 96 at 4. These sites were known to law enforcement agencies around the world for distributing child pornography. R. 96 at 4. In mid-2014, the FBI's Child Exploitation Unit learned that "a third-party private entity in the United States" developed a way to unmask the true IP addresses for users of a Tor-based messaging service. R. 96 at 4. Through subpoenas, the FBI learned that TLZ was being hosted in the Netherlands and the site's head administrator lived in Australia. RSA:25; R. 73 at 2; R. 96 at 4.

With this information, the FBI launched a coordinated international investigation. First, they shared the server location with Dutch law enforcement to learn who paid for the hosting service. R. 62-1 at 1. After the Dutch authorities seized the server, they sent a copy of the TLZ server to the FBI. R. 62 at 8; R. 96 at 4. The Dutch investigators also sent a copy to an Oceanian child exploitation unit, Task Force Argos, which included agents from Australia's Queensland Police Service and New Zealand's Department of Internal Affairs. RSA:25; R. 73 at 2; R. 96 at 5. Australia authorities arrested TLZ's head

administrator and seized more copies of TLZ that contained all user activity, including private messages and profile posts, among other information. R. 48 at 2; RSA:25; R. 73 at 2. They also gave the FBI a copy. R. 65-1 at 2-3.

At this point, the FBI "began working in cooperation" with foreign law enforcement agencies, mainly Task Force Argos agents, to unmask and arrest TLZ's users. R. 96 at 4-5. Beginning in June 2014, the FBI's child exploitation unit had weekly meetings with the Oceanian authorities, where various tasks were delegated between the agencies. R. 92 at 22. The Oceanian authorities regularly provided copies of TLZ to the FBI. RSA:28-29; R. 73 at 5-6; R. 65-1 at 2-3. In turn, the FBI extracted data from these copies and created a database that allowed them to quickly generate reports that were shared among the agencies. RSA:29; R. 73 at 6; R. at 65-1 at 2-3. Not only did the FBI create this database for foreign law enforcement, but they also subpoenaed the "third-party private entity" to identify IP addresses for targets at foreign authorities' request. R. 96 at 5. During one of the conference calls, the agencies discussed a plan to conduct the same type of watering hole operation that the FBI conducted before.

On June 6, 2014, Australian authorities informed the other agencies that they could "takeover and operate TLZ" in an undercover capacity. R. 96 at 5 n.2. The plan was for Task Force Argos to bring TLZ back online and use an "identifying technique" that it was developing to unmask users' true IP addresses. R. 62-1 at 2-3; R. 65-1 at 2; R. 96 at 8-11. Using this technique, Task Force agents discovered that a TLZ user named "Cyberguy" lived in the United States and gave the information to the FBI. RSA:25-26; R. 73 at 2-3. In turn, the FBI agents linked Cyberguy's IP address to Mr. Mitrovich, and

used information derived from the technique to obtain a warrant. RSA:25-26; R. 73 at 2-3. Although the government claimed that the Oceanian authorities decided for themselves to employ this technique, the FBI knew about the plan months before it began. R. 96 at 8-10. The technique's creator even drafted a technical overview for FBI agents and offered to give them more details. R. 92 at 30-34.

### III.  The Identifying Technique

Although the complete technical details remain undisclosed, the identifying technique worked by luring users into clicking a URL hyperlink, revealing their real IP address to a government server. R. 53 at 1-2. In November 2014, after running the site for several months, Task Force Argos agents embedded the link into TLZ which previewed an illicit video and offered a website allowing video steaming. RSA:25; R. 73 at 2; R. 96 at 5-8. When users clicked on the link, a pop-up message appeared, alerting users that they were attempting to open a file from "http://streaming.thelove.zone" and asking, "What should TorBrowser do with this file?" R. 96 at 7. If the user clicked "OK," the video began streaming through Windows Media Player. R. 96 at 7.

But this video was not downloaded through the Tor network. Somehow, this URL link forced computers to download the video *outside the Tor browser,*" revealing the users' true IP address. RSA:14; R. 114 at 2 (emphasis original). The technique also produced a "session identifier" that tied the IP address to a particular TLZ user account. R. 53 at 2. The government claimed that the video file was hosted on a server "not within the Tor network." R. 53 at 6. So when users clicked the URL link, according to the government, they were redirected to the open, regular internet outside of Tor and which

8

exposed their IP address. R. 53 at 2; *see also* Hr. Tr. at 4 (government claiming that the link "just connects over a public IP address.").

Yet there was a problem with the government's claim: that is not how Tor worked. *See* R. 56 at 4-7. For instance, Tor users can visit any regular internet website and remain anonymous. R. 56 at 5-6. They can visit Facebook or YouTube while still masking their true IP addresses. R. 56 at 5-6.[3] In fact, activist groups encourage people living under oppressive regimes to use the network to avoid internet censorship.[4] And users can download files and stream videos through the network as well. R. 56 at 5-6. Instead, the URL had to be doing something more than just directing users to a regular internet site; it had to *force* the computer to open a connection outside the network. RSA:14, R. 114 at 2.

## IV.    Compelling Discovery: The District Court Finds Prima Facie Evidence that the Joint Investigation Conducted a Fourth Amendment Search

Considering how Tor functioned, the evidence suggested that the URL held a computer code which downloaded to his computer and forced it to connect outside Tor. Mr. Mitrovich believed the identifying technique operated just like another FBI malware, called NIT, which was used to identify Tor users in other investigations. R. 56 at 9-12. He requested information from the government about: 1) the FBI's cooperation with

---

[3] Internet archives show that users could stream videos on Tor around the time the identifying technique was deployed. *See* Tor Project, *Users of Tor*, (archived Nov. 1, 2014), https://tinyurl.com/4zm9dm4w ("If you live in a country that has ever blocked Facebook or YouTube, you might need to use Tor to get basic internet functionality).

[4] *See* Jamie Tarabay, *Myanmar Citizens Use Protester Toolkit to Skirt Internet Ban*, Bloomberg, (Mar. 24, 2021), https://tinyurl.com/33335ue9

Oceanian authorities; and 2) the identifying technique and how it operated. R. 48 at 1. He sought all information about the technique's ability to identify Tor users and redirect them from Tor to the open internet. *See* R. 62 at 1-2. But the government refused his requests. In short, it claimed that it was not responsible for Task Force Argos's conduct but, even if it were, the technique could not have violated the Fourth Amendment because Mr. Mitrovich lacked any privacy interest in his IP address. RSA:27; R. 73 at 4.

Mr. Mitrovich moved to compel disclosure under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, arguing that the sought-after information was needed to mount a Fourth Amendment challenge. RSA:27; R. 73 at 4; R. 48 at 1; R. 56 at 1, 15-22; R. 65. His argument boiled down to two main points. First, while the Fourth Amendment seldom applies to foreign law enforcement actions, it applied to the Oceanian authorities because they were in a joint venture with the FBI. RSA:27-28; R. 73 at 4-5 Second, the Task Force's technique implicated the Fourth Amendment because it was the functional equivalent to a physical trespass: the technique most likely infected his computer with code and forced it to reveal itself. *See* Hr. Tr. at 6.

To counter, the government denied that there was a joint venture and that any code was sent to his computer, relying on an interview conducted with an FBI agent in March 2020—more than five years after the technique was used. R. 62 at 6-9. But the interview presented more questions than answers. The agent's account about the warning message clashed with the government's earlier claims. R. 62-1 at 2 (claiming it "advised [users] that it would be taking them outside Tor[.]"); R. 62-1 at 2; R. 53 at 2 (claiming it warned that the file was "from an external website."). Compounding inconsistencies, the agent

claimed the FBI only learned about the technique after it was deployed. R. 62-1 at 1-2. But, according to the government's own words, this too was wrong. R. 62 at 8 n.5. While he claimed that the technique did not involve "hacking" or "malware," he also admitted that he did not know the technique's "minute details." R. 62-1 at 2.

In the end, the district court found that Mr. Mitrovich made prima facie showings that: 1) there was a joint venture between the agencies; and 2) "that malware was used to obtain his IP address." RSA:29-32; R. 73 at 6-9. As a result, "his motion to compel [could not] be denied based on the Government's assertion" that there was no joint venture or that the technique did not use malware. RSA:31-32; R. 73 at 8-9. Though it allowed future targeted objections, the district court compelled the government to produce discovery about the joint venture and how the technique operated because "Mr. Mitrovich made prima facie showing that the discovery is material to a Fourth Amendment motion to suppress[.]" RSA:32; R. 73 at 9.

## V. The Government's Disclosure Suggests That Code Was Uploaded to Computers But Fails to Explain How the Technique Unmasked Users

The government produced discovery showing that the FBI and Task Force Argos agents worked closely together to investigate TLZ. For example, there were hundreds of emails between the agencies over a six-month period, totaling nearly a thousand pages. R. 92 at 3. And it exposed that the agencies assisted with each's request, even providing information needed for criminal prosecutions. R. 96 at 5. They also shared technical assistance and resources. R. 96 at 4-5. Months before the technique was used, the

technique's creator emailed an FBI agent stating that the Task Force was "using a system built by you guys[.]" R. 96 at 9.

There were also emails from the technique's creator that showed he was sharing more detailed information around this time. He was developing a "prototype system" which allowed law enforcement to "map users" on "pretty much any network we can get a link to[.]" R. 96 at 9. About a month later, he sent the FBI a technical overview of the technique. This overview diagramed the process, described using "attack vector[s]," and explained how his technique would bait users by "always changing" the available "streaming content[.]" R. 92 at 30-34. The FBI took screenshots of how the URL hyperlink appeared to TLZ users. R. 92 at 3.

But the government did not produce the technique's source code showing how the technique affected users' computers, as the district court ordered. Nor did any of the documents answer this question. Mr. Mitrovich's forensic examiner, Jeff Fischbach, found that the documents provided "no information" about what was on the other side to the link: there was no way to tell what content was "accessed or downloaded." R. 92 at 66, ¶ 7. To be sure, the technical overview did suggest that the technique caused "'Download' activity" through a computer port known for malware exploits. R. 92 at 67-68, ¶¶ 9-10. But the documents provided "little [] or no value in determining what is specifically transferred to a user's computer when their browser follows [the] link." R. 92 at 67, ¶ 8. Without the source code or technical details, he explained, "it [was] impossible to prove, ex-post-[facto], in what way(s) a user's computer could have been manipulated in order to circumvent that user's privacy." R. 92 at 68, ¶ 12.

12

## VI.    The District Court Excuses the Government's Failure to Explain How the Identifying Technique Operated

When the government denied further requests, claiming it did not "possess" the source code or information, Mr. Mitrovich moved for sanctions. *See* R. 92; R. 97; RSA:16; R. 114 at 4. He argued that the government was responsible for disclosing the source code because, through its joint investigation with Oceanian authorities, the government constructively possessed the material. By not providing the information, the government: 1) violated Rule 16 and the court's prior order because it constructively possessed the material; and 2) violated *Brady* by withholding evidence material to his Fourth Amendment rights. *See* R. 92; R. 97 at 17.[5] As a result, he sought sanctions to either suppress the evidence derived from the identifying technique or dismiss the indictment under Rule 16(d)(2) and court's supervisory powers. *See* R. 92; R. 97.

The government did not contest that the source code was material. *See* R. 96 at 13-20. Instead, the government claimed that it made a good-faith effort to obtain the material, but that Oceanian authorities would not tell them how the technique operated. R. 96 at 13-20. So even if the government constructively possessed the material, it claimed that their good-faith effort fulfilled their obligations. R. 96 at 15-19. True, the government contacted former Task Force Argos agents in response to the discovery order, and they declined to reveal the technical details. R. 96 at 13 n.6. But the technique's creator offered to give the technical details to the FBI agents during the investigation if

---

[5] Mr. Mitrovich also alleged that this violated other rights, like his Sixth Amendment right, but these are not relevant to this appeal.

the agents gave him technical details of their techniques. *See* R. 92 at 72 (discussing, in an internal FBI email, if the agency would share the technical details of NIT—which already leaked online—to learn more details about the technique). The FBI, however, declined his offer despite knowing that the Department of Justice and judicial system require a "more specific explanation of how it functions" to prosecute the leads and determine the technique's reliability. R. 92 at 76-78.

The district court declined to sanction the government for failing to produce the information. RSA:23; R. 114 at 11. First, it found that under Rule 16, the government need only produce the material it possesses. Even if there were a joint investigation, the government need only make a good-faith effort to obtain the material. RSA:18-19; R. 114 at 6-7. It adopted this good-faith rule from the Second Circuit, which crafted the rule for the Jencks Act. Second, it rejected his *Brady* and due process claims because the material value of the evidence was speculative and because there was no "Government-imposed obstacle" that denied Mr. Mitrovich access to the evidence or ability to present defense based on the source code. RSA:20-23; R. 114 at 8-11. Ultimately, the district court declined sanctions under any claim while recognizing that the disclosures "may be too vague to allow anyone" to understand how the URL worked. RSA:22; R. 114 at 10.

* * *

Mr. Mitrovich entered a conditional plea, preserving his right to appeal the sanctions dispute. R. 130 at 13. He does so now.

14

## SUMMARY OF THE ARGUMENT

*First*, Mr. Mitrovich deserved the technical details under Federal Rule of Criminal Procedure 16(a)(1)(E) because he showed that the technique likely invaded his computer in the same way as other Tor identifying methods. This meant the identifying technique engaged in a Fourth Amendment search and the fruits could be suppressed. The district court adopted the Second Circuit's good-faith rule that excused the government's failure to produce the material. This was wrong. The Second Circuit's rule is based on law that conflicts with this Circuit's joint venture doctrine. While the joint venture doctrine holds the government responsible for foreign authorities taking part in a joint investigation, the Second Circuit's more restrictive test does not.

*Second*, even if the government did not violate Rule 16, it violated *Brady*. Mr. Mitrovich's Fourth Amendment challenge hinged on how the technique operated. All the evidence suggested that his theory was correct: the technique most likely invaded his computer and forced it to act. There was a reasonable probability that the evidence would have been suppressed. A search occurs where the computer is located, meaning this search occurred on American soil. Thus the Warrant Clause applied. But even if the Clause did not apply, the search was still unreasonable. Not only did the technique invade his home and property, but the technique leveraged real child abuse videos as bait.

# ARGUMENT

## I. The District Court Erred by Excusing the Government's Failure to Produce the Technique's Source Code or Technical Details Explaining How It Identified Mr. Mitrovich's Computer

Mr. Mitrovich presented a cogent defense theory about why the identifying technique likely conducted a search by invading his computer and forcing it to act. All the evidence pointed to this theory being correct. He was entitled under Rule 16 to learn exactly how the technique operated. The government's good-faith effort did not excuse its failure to provide the technical details. This excuse was etched for a different rule, in a different circuit, and based on different law than this Circuit applies to foreign searches. The only adequate remedy was to suppress the evidence.

### A. Standard of review

In this case, the district court interpreted Federal Rule of Criminal Procedure 16 to require only that the government make a good-faith effort to obtain discovery. RSA:17-19; R. 114 at 5-7. Usually, this Court reviews Rule 16 orders for an abuse of discretion, reversing when "there is an appreciable risk that prejudice resulted." *United States v. Owens*, 18 F.4th 928, 940 (7th Cir. 2021) (cleaned up). But this Court reviews a district court's Rule 16 interpretation *de novo*. *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020) ("We review questions of statutory interpretation and of rule interpretation *de novo*."); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 623 (7th Cir. 2000) ("The issue of whether [the defendant] must show that the government acted in bad faith is a question of law that we review de novo.").

16

### B.    Mr. Mitrovich was entitled to the material because he made a *prima facia* showing that the joint investigation conducted a Fourth Amendment search to identify his computer

As the district court agreed, Mr. Mitrovich met his burden to learn the technical details about how the identifying technique operated. RSA:31-32; R. 73 at 8-9. Using the FBI's own reports and press releases, he showed the FBI took part in a joint venture with Oceanian law enforcement. R. 65 at 4-8. And he showed that the identifying technique likely invaded his computer just like the FBI's NIT malware had done in other Tor investigations. R. 56 at 7-12. If these proved true, then a Fourth Amendment search—into an American citizen's own home on American soil—occurred without a warrant.

Rule 16 entitles defendants to discovery if it is "material to [their] defense." Fed. R. Crim. P. 16(a)(1)(E). This includes Fourth Amendment challenges. *United States v. Soto-Zuniga*, 837 F.3d 992, 1000-01 (9th Cir. 2016); *see also United States v. Vinas*, 910 F.3d 52, 62 (2d Cir. 2018) (explaining that defendants are prejudiced by a Rule 16 violation if the material could lead to "a non-frivolous motion to suppress[.]"). If a "*prima facie*" showing is made that the material played "an important role" in their defense, then they are entitled to the discovery. *Owens*, 18 F.4th at 940. The government must even disclose "confidential software" when defendants present a "cogent defense theory" that examining the code "would help develop." *Id*.

This is exactly what Mr. Mitrovich established: the technical details would confirm whether the identifying technique sent code to his computer and forced it to unmask. RSA:30-32; R. 73 at 7-9. Tor would prevent his computer from exposing its true IP address if it was just a video hosted on regular, open internet. *See* Jonathan Mayer,

*Government Hacking*, 127 Yale L. J. 570, 587-88 (2017) (explaining how government malware exploits vulnerabilities to bypass Tor settings and prevent computers "from sending traffic through Tor."). Later disclosures supported his theory. Though the discovery was too vague to determine how the technique worked, it suggested that the technique caused "download activity" involving a port known for malware. R. 92 at 67-68, ¶¶ 9-10. Even the technical overview discussed pushing computers to connect outside Tor. R. 92 at 33.

If his theory proved true, then the technique operated just like the government's NIT malware and conducted a Fourth Amendment search. *See United States v. Darby*, 190 F. Supp. 3d 520, 530 (E.D. Va. 2016) ("NIT was a Fourth Amendment search" because it "invaded the contents of his computer[.]"), *aff'd*, 721 Fed. App'x 304 (4th Cir. 2018). The identifying technique mirrored the NIT malware. As here, NIT was uploaded onto illicit Tor hidden services where it infected visitors' computers, forcing the devices to connect to a government-controlled server and send their true IP address. *United States v. Grisanti*, 943 F.3d 1044, 1047 (7th Cir. 2019); *see also United States v. Horton*, 863 F.3d 1041, 1045 (8th Cir. 2017). Also as here, the NIT malware forced computers to produce a unique "session identifier." R. 53 at 2; *Kienast*, 907 F.3d at 526. These identifying techniques constitute Fourth Amendment searches. *See*, *e.g.*, *Taylor*, 935 F.3d at 1284.

Mr. Mitrovich had a right to learn how the technique really operated. And he did not have to take the government's word to the contrary. *See Owens*, 18 F.4th at 940. This Court recently warned that the government "does not have a blank check to operate" confidential identifying software "sans scrutiny." *Id*. If the defendant meets their burden

under Rule 16—which is "not a heavy burden"—the software must be disclosed even if the government claims it would not help the defendant. *Id.*; *see also United States v. Budziak*, 697 F.3d 1105, 1112-13 (9th Cir. 2012) ("Criminal defendants should not have to rely solely on the government's word that further discovery is unnecessary.").

In short, Mr. Mitrovich presented more than a "cogent theory" about how the identifying technique committed a search. His Fourth Amendment challenge hinged on how the technique operated. He had a right to find out.

### C. The Government's duty under Rule 16 extends to all agencies taking part in the joint investigation

Even if the source code or technical details were possessed solely by Task Force Argos agents, the government was still required to obtain the material because the agencies were in a joint investigation. Though Rule 16(a)(1)(E) applies to material in the "government's possession, custody, or control," the Rule reaches all agencies that were part of the prosecution team. *See United States v. Gray*, 648 F.3d 562, 565 (7th Cir. 2011); *United States v. Bases*, 549 F. Supp. 3d 822, 824 (N.D. Ill. 2021); *see also United States v. Libby*, 429 F. Supp. 2d 1, 9 n.15 (D.D.C. 2006) ("[T]he possession, custody, or control analysis under *Brady* is identical to the analysis under Rule 16."). The government is responsible for any material possessed by investigating agencies. *Id*. If the agencies were part of the prosecution team, as the Task Force Argos agents were here, then the government needed to obtain information in their possession.

To be clear, the district court assumed that the FBI was in a joint investigation with Oceanian law enforcement. *See* RSA:22; R. 114 at 10. ("For purposes of evaluating

Mitrovich's *Brady* claim, then, the court assumes without deciding that the United States constructively possesses the source code that he now seeks.").[6] And for good reason too. Agencies are considered members of the prosecution team when, as here, they are closely aligned with investigating agencies or help gather the facts. *See Bases*, 549 F. Supp. 3d at 825-26.

The government's duty to obtain material from these agencies extends across jurisdictions and sovereigns. *United States v. Risha*, 445 F.3d 298, 303-06 (3rd Cir. 2006) (recognizing "cross-jurisdictional constructive" possession and rejecting bright line rule that the government's duty to disclose was limited to same sovereigns). For example, state prosecutors must disclose information even if it were possessed only by federal investigators. *See Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). The focus is on the investigators' involvement rather than their sovereign. *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (holding that the government's duty extended to state investigators taking part in a joint federal-state investigation).

So when the district court imputed the government with constructive possession, it "impose[d] upon the prosecutor the responsibility to disclose" the source code even though it was "possessed solely by those actors assisting him in investigating[.]" *Fields v.*

---

[6] Though the District Court explicitly assumed that the agencies were in a joint investigation when addressing the *Brady* claim, it must have also assumed this premise for its Rule 16 analysis. For example, the government argued that an evidentiary hearing was required to determine if there was a joint investigation. R. 96 at 15 n.7. It also argued that, alternatively, it was excused from obtaining the information, under both Rule 16 and *Brady*, because it made a good faith effort. R. 96 at 15-19.

*Wharrie*, 672 F.3d 505, 513 (7th Cir. 2012). Here, it was as if the government possessed the material. *See United States v. Morris*, 80 F.3d at 1151, 1169 (7th Cir. 1996); *Gray*, 648 at 566 ("Otherwise investigators assisting in a prosecution could conceal from the prosecutors exculpatory evidence that the investigation had revealed and then the evidence would never be revealed to the defense."). Even if Task Force Argos solely possessed the technical details, the government was deemed to have access to the information. *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (imputing knowledge from the Marshals to the prosecutors); *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) ("It is well settled that if a member of the prosecution team had knowledge of *Brady* material, such knowledge is imputed to the prosecutors.").

The government's disclosure duty cannot be fulfilled by mere good-faith efforts, and it is responsible for material even if it is impossible for it to possess. *See Fields*, 672 F.3d at 505 (stating that the government may violate *Brady* by failing to disclose "evidence possessed exclusively by those actors assisting him in investigating[.]"). For example, in *United States v. Mota*, an investigator failed to record and report a witness interview. 685 F.3d 644, 647-48 (7th Cir. 2012). The prosecutor was still charged with disclosing this material even though nothing existed for him to disclose. *Id*. For the same reason, in *McCormick v. Parker*, the prosecutor violated *Brady* because he failed to disclose that a nurse lied about being certified as a sexual assault examiner. 821 F.3d 1240, 1247-49 (10th Cir. 2016). Even though only the nurse knew she lacked certification, the prosecutor was still responsible for disclosing the information. *Id*.

21

**D.    The Government's good-faith effort does not excuse their inability to produce the material because they were imputed with constructive possession**

The district court crafted a new rule to excuse the government from its duty to disclose. Despite charging the government with constructive possession, the district court held that the government need only make a good-faith effort to obtain the material. RSA:18-19; R. 114 at 6-7. It plucked this good-faith rule from a Second Circuit case addressing the Jencks Act, *United States v. Lee*, 723 F.3d 134, 141 (2d Cir. 2013). This was wrong. Not only does the Jencks Act differ in scope from Rule 16, but the Second Circuit does not even follow this Circuit's joint venture doctrine. The rule was flawed from the start. Good faith plays no role in producing material it constructively possesses.

The Second Circuit's good-faith rule—based on the Jencks Act—does not apply to Rule 16 and is based on law that conflicts with this Court's joint venture doctrine. RSA:18; R. 114 at 6. This rule originated in *United States v. Paternina-Vergara*, 749 F.2d 993, 996-98 (2d Cir. 1984). There, the defendants sought statements under the Jencks Act that they believed foreign law enforcement possessed. *Id*. at 996 (citing 18 U.S.C. § 3500). The Second Circuit held that the government met its Jencks Act's obligations through making a good-faith effort because "there is no reason to think that Congress expected that such cooperation [between foreign and domestic law enforcement] would constitute the foreign officials as agents of the United States for purposes of the Jencks Act." *Id*. at 998.

For one thing, the Second Circuit provided nothing to support that this was really Congress's intent. *Id*. at 996-98. This was not based on statutory construction or

legislative history. *Cf. Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, beings with text."). It was a bare conclusion. Even more to the point, this rule ignores that the Jencks Act is narrower than Rule 16 and *Brady*.

Possession under the Jencks Act is more limited than possession under Rule 16. For example, not long after *Paternina-Vergara* was decided, the Ninth Circuit addressed the government's duty to obtain material from investigators extended outside the jurisdiction. *United States v. Bryan*, 868 F.2d 1032, 1034-37 (9th Cir. 1989). Earlier, the Ninth Circuit had interpreted the Jencks Act's "possession of the United States" language to mean statements possessed only by "the prosecutor," not investigating agents. *Id. at* 1035 (citing *United States v. Polizzi*, 801 F.2d 1543, 1552 (9th Cir. 1986)). But it rejected that Rule 16 and *Brady* were limited in the same way. *Id*. at 1035-36. "Nothing in the text" limited Rule 16 to documents that only the prosecutor possessed. *Id*. at 1036. Instead, Rule 16 and *Brady* extended to any agency "participating in the same investigation"—even if located outside the jurisdiction—because it would be unfair to allow the government to use the material while denying the defendant access. *Id*. at 1036.

This interpretation aligns with the rules' purposes because the Jencks Act limits the government's discovery duty while Rule 16 expands it. *See United States v. Steurer*, 942 F. Supp. 1183, 1190 (N.D. Ill. 1996) (explaining the Jencks Act does not grant "a right to pretrial disclosure[.]"). Rule 16 aims to grant defendants broader discovery rights. *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010); Fed. R. Crim. P. 16, Advisory Committee's Note (1974) (explaining the rule was amended "in the view that broad discovery contributes to the fair and efficient administration of justice[.]"). In

contrast, the Jencks Act limits the defendant's access to statements. *United States v. Harris*, 542 F.2d 1283, 1291 (7th Cir. 1976).

Consider a witness statement that falls under both Rule 16 and the Jencks Act. Even though Rule 16 would require pretrial disclosure, the Jencks Act prevents defendants from obtaining the statement until after the witness testifies at trial. *See United States v. Callahan*, 534 F.2d 763, 766 (7th Cir. 1976) ("the language of [the Jencks Act] precludes Defendant's Rule 16 pretrial discovery[.]"). In this way, the Jencks Act does not grant discovery rights at all. It does not follow that the same rule should be applied to Rule 16 which aims to grant broad discovery rights.

Above all, the Second Circuit's good-faith rule hinges on law that conflicts with this Court's joint venture doctrine. Unlike this Circuit, the Second Circuit has "repeatedly" rejected the joint venture doctrine. *United States v. Getto*, 729 F.3d 221, 233 (2d Cir. 2013); *Lee*, 727 F.3d at 140 n.4 ("[W]e explicitly acknowledge—and declined to adopt—the 'joint venture' theory employed by other courts of appeal to determine whether the conduct of foreign law enforcement rendered them 'virtual agents' of the United States."). Instead, it imposes a stricter test, requiring that American agents control or direct foreign law enforcement before applying the Fourth Amendment. *Id.* at 230; *see also United States v. Cotroni*, 527 F.2 708, 712 (2d Cir. 1975) (declining to apply the Fourth Amendment when American agents "did not in any way initiate, supervise, control or direct the [search]."). Based on this restrictive test, the Second Circuit concluded that the government need only make a good-faith effort because it did not believe that cooperation transforms foreign officials into agents of the United States.

24

*Paternina-Vergara*, 749 F.2d at 997-98. Put differently, the government need only make a good-faith effort because the American agents are not responsible unless they directly control the foreign actors.

But this reasoning, however, conflicts with the joint venture doctrine where substantial participation is enough. Under the joint venture doctrine, the Fourth Amendment is triggered if American agents "substantially participated" in the search in a way that "amounted to a joint operation[.]" *United States v. Stokes*, 726 F.3d 880, 890-91 (7th Cir. 2013). American agents need not actually control or direct foreign officials, as the Second Circuit requires. *Id.* at 890-91 (applying the doctrine if foreign agents "were essentially acting as agents for their American counterparts *or* the search amount to a joint operation[.]") (emphasis added). Instead, the joint venture doctrine turns on the American agents' cooperation and participation in the investigation. *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (finding joint venture applied based on analyzing American agents participation); *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012) (explaining the doctrine applies "where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts."); *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976) (stating doctrine applies when American agents substantially participate).

The conflict between these two approaches is clear: the Second Circuit's rule requires direct control from American agents over foreign officials, while this Court requires only substantial participation or cooperation. In this way, the joint venture doctrine acts much like the prosecution team, focusing on the investigator's involvement.

25

*Compare Morris*, 80 F.3d at 1169 (stressing that the prosecution team includes those that "investigated [the] case" or "participated in its prosecution[.]") *with Stokes*, 726 F.3d at 890-91 (explaining the doctrine applies when agents "substantially participated" or were in a "joint operation[.]"). The joint venture doctrine thus renders the government more responsible for foreign officers than the Second Circuit would allow. The good-faith rule therefore does not fit with the joint venture doctrine.

At bottom, the Second Circuit's good-faith effort rule is based on different rules, serving different purposes, applied to a different view on foreign searches. It was never designed to encompass the joint venture doctrine. It should not have been applied.

### E.     The evidence derived from the identifying technique should have been suppressed because it was the least severe sanction to cure the prejudice caused by being denied the technical details

Having established that he was entitled to the technical details, Mr. Mitrovich was also entitled to a remedy that redressed the resulting prejudice. Rule 16(d)(2) empowers courts to craft different remedies to cure the prejudice stemming from a Rule 16 violation. *United States v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006). This includes suppressing evidence. Fed. R. Crim. P. 16(d)(2)(C)-(D). Withholding the technical details stripped Mr. Mitrovich of his ability to contest the unlawful search. Here, the only remedies that could cure this prejudice were suppressing the evidence or dismissing the indictment.

Despite all evidence suggesting that the technique sent code to Mr. Mitrovich's computer, forcing it to act as it otherwise would not have, the government tried dodging these facts, claiming the technique was "non-invasive." R. 96 at 13 n.6; *see also* R. 53 at

5-7; R. 62 at 4-5. The government continued to make these claims even though Mr. Mitrovich's expert explained that the materials signaled that the technique caused download activity and exploited computer vulnerabilities. R. 92 at 66-68. There was nothing further that Mr. Mitrovich could do at that point. The material was "too vague" to determine program's specifics. RSA:22; R. 114 at 10.

Mr. Mitrovich did not "have to rely solely on the government's word" that the program operated differently. *Owens*, 18 F.4th at 940 (cleaned up). But this is exactly what he was forced to do. The government did not even offer any sworn statements from anyone that knew the technique's details. R. 62-1 at 2. The closest was an anonymous former Task Force agent who called it "non-invasive." R. 96 at 13 n.6. He was thus denied a meaningful chance to challenge the search. This prejudice required a remedy.

The aim in crafting Rule 16 sanctions is to "cure the damage caused by the government's nondisclosure." *United States v. Mackin*, 793 F.3d 703, 711 (7th Cir. 2015). So if the prejudice calls for a severe sanction, then it must be given. *See United States v. Lawrence*, 788 F.3d 234, 244 (7th Cir. 2015) (explaining that severe remedies are warranted when "less drastic remedies are inadequate.") (cleaned up). Defendants are prejudiced when the Rule 16 violation prevents them lodging a motion to suppress evidence. *Vinas*, 910 F.3d at 58.

In that event, defendants must be given a remedy that protects their right to seek suppression and develop their theories. *See United States v. Alvarez*, 987 F.2d 77, 85-86 (1st Cir. 1993) (finding the district court abused its discretion by failing to order a remedy that protected the defendant's right to suppress his statements); *United States v.*

27

*Camargo-Vergara*, 57 F.3d 993, 998-99 (11th Cir. 1995) (finding the district court abused its discretion when the government disclosed the defendant's statements late because he could have "moved to suppress the statement" before trial). In *Vinas*, the government failed to disclose information that suggested law enforcement agents violated the defendant's *Miranda* rights. *Vinas*, 910 F.3d at 56-57. The district court abused its discretion by providing "no meaningful opportunity" to suppress the statements. *Id.* at 63. Because, as here, the defendant had non-frivolous grounds to suppress the evidence, he was entitled to a meaningful opportunity to present his challenge. *Id.*

As these cases recognize, Mr. Mitrovich was entitled to a remedy that protected his right to develop his motion to suppress. As in *Vinas*, he showed a concrete basis to suppress the evidence. Even the district court agreed. RSA:29-32; R. 73 at 6-9. But he needed the technical details to present a meaningful claim. He thus was entitled to a remedy that fit being deprived of the technical details. The only remedies that did so were suppressing the evidence or dismissing the indictment.

## II. Mr. Mitrovich's *Brady* Rights Were Violated Because He Could Not Present a Meaningful Fourth Amendment Challenge

The government was also obligated to produce the source code or technical details under *Brady*. As discussed above, Mr. Mitrovich's motion hinged on how the technique operated. And the discovery supported that he was right: it suggested some code *was* downloaded to his computer. R. 92 at 67-98, ¶¶ 9-10. *Brady* entitled him to the material.

The government violates *Brady* by: 1) suppressing; 2) favorable evidence; that 3) could reasonably affect the proceeding's outcome. *Mota*, 685 F.3d at 648. This includes

28

evidence material to Fourth Amendment challenges, like Mr. Mitrovich's here. *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000). The district court assumed that the government constructively possessed the technical details. RSA:22; R. 114 at 10. As a result, the government suppressed these details when it failed to produce them. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).

Mr. Mitrovich established the remaining *Brady* requirements because 1) the evidence suggested that the technical details would have confirmed his theory that a search occurred; and 2) there was a reasonable probability that he could have suppressed the unlawful search. *United States v. Thomas*, 835 F.3d 730, 735 (7th Cir. 2016). The identifying technique likely invaded into his home on American soil—the Constitution's most protected area of privacy. He was entitled to meaningful chance to vindicate his rights.

### A.     Standard of review

This Court reviews the district court's denial of Mr. Mitrovich's *Brady* motion for an abuse of discretion. *United States v. Ashley*, 54 F.3d 311, 312-13 (7th Cir. 1995); *see also United States v. Laurent*, 607 F.3d 895, 901 (1st Cir. 2010) ("To the extent that the nondisclosure was a violation, of either *Brady* or Rule 16, we review the district court's remedy for abuse of discretion.").

**B.     Mr. Mitrovich sought the technical details under *Brady* to develop a Fourth Amendment motion to suppress**

Mr. Mitrovich made clear that he sought the source code and technical details to make his Fourth Amendment challenge under both Rule 16 and *Brady*. R. 48 at 1; R. 92 at 1; R. 97 at 6-15. From the beginning, he sought the material through Rule 16, "*Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny" to develop his theory that the technique engaged in a search. R. 48 at 1, 15-17; *see also* R. 65 at 18 (requesting the material to lodge "a Fourth Amendment based motion to suppress."). In its opinion denying sanctions, the district court mistakenly believed that Mr. Mitrovich did not argue that he had a *Brady* right to the "material relevant to only a Fourth Amendment claim." RSA:19-20; R. 114 at 7-8. But that was wrong.

Mr. Mitrovich always sought the material to vindicate his Fourth Amendment rights, repeatedly arguing that he was entitled under Rule 16 and *Brady*. *See*, *e.g.*, R. 92 at 12, 18-25.[7] Not only did he repeatedly invoke *Brady* in this context, but the district court also understood him to be invoking *Brady* to mount his challenge: "Mitrovich moves to compel … arguing that the investigative tools used to reveal his true IP address may have violated the Fourth Amendment, and therefore that *Brady v. Maryland* [] and Rule 16(a)(1)(E) require disclosure[.]" RSA:27; R. 73 at 4.

---

[7] *See also* R. 97 at 17 (listing the ways non-disclosure violated Mr. Mitrovich's *Brady* and due process rights which included "mount[ing] a meaningful Fourth Amendment challenge[.]"); R. 65 at 16-18 (explaining the discovery was needed to develop his theory that the identifying technique invaded his computer).

### C. The *Brady* rule extends to material needed to contest unconstitutional searches

The technical details struck at the heart of Mr. Mitrovich's Fourth Amendment challenge. At its core, any challenge hinged on how the technique operated. Although this Court declined to find that the failure to apply *Brady* to suppression hearings was plain error, *Thomas*, 835 F.3d at 734, most courts addressing the issue find that *Brady* extends to Fourth Amendment challenges. *See Gamez-Orduno*, 235 F.3d at 461 (stating that the government violates due process by suppressing "material evidence helpful" to a "motion to suppress[.]"); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992); *Biles v. United States*, 101 A.3d 1012, 1019 (D.C. 2014) (collecting federal cases and finding that all courts to "squarely addressed the issue have held that the failure to disclose information material to a ruling on a Fourth Amendment suppression motion can constitute a *Brady* violation."). These courts recognize that *Brady* extends beyond exculpatory evidence. *See United States v. White*, 489 F. Supp. 3d 274, 280-81 (S.D.N.Y. 2020) ("Rather, *Brady* covers evidence that is material to the Government's ability to prove guilt."). In the same way, this Court recognizes that *Brady* includes evidence even if it "is not inherently exculpatory." *United States v. Young*, 20 F.3d 758, 764 (7th Cir. 1994).

It makes sense to extend *Brady* to Fourth Amendment challenges. Consider the implications of denying such an expansion. Without this extension, defendants would be "effectively deprived" of the ability to protect their Fourth Amendment rights during suppression hearings. *United States v. Barton*, 995 F.2d 931, 934-35 (9th Cir. 1993). In

*Barton*, the *Brady* rule applied to material that impeached false claims in a search warrant affidavit. *Id.* Otherwise, the Fourth Amendment "'would be reduced to a nullity'" if the government could conceal that evidence that its officers lied to obtain a search warrant. *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (1978)). Echoing this concern, this Court upheld suppressing evidence seized from a search warranted based on false statements. *United States v. Cortina*, 630 F.2d 1207, 1213-14 (7th Cir. 1980). The justice system would be "of little value" if false search warrant affidavits could go unchecked. *Id.* at 1214; *see also United States v. Fisher*, 711 F.3d 460, 464-67 (4th Cir. 2013) (finding a *Brady* violation allowed the defendant to withdraw his plea when "an officer's deliberate lie that led to the warrant that led to the discovery of the evidence against him."). Thus, *Brady* must extend.

This aligns with Supreme Court precedent requiring courts to prevent admitting unconstitutional evidence. For example, it has long held that courts have a supervisory duty to ensure that unlawfully seized evidence is not admitted into trial. *See Mapp v Ohio*, 367 U.S. 643, 648 (1961); *Weeks v. United States*, 232 U.S. 383, 394 (1914) (rejecting that notion that courts could "not inquire into the manner in which [evidence was] obtained."). "[I]f *Brady* covers evidence that impeaches a key government witness," then it should also "cover material that impugns a key piece of Government evidence[.]" *White*, 489 F. Supp. 3d at 281.

**D.      The technical details were favorable because the evidence suggested that the identifying technique conducted a search just like other government malware**

The evidence supported Mr. Mitrovich's theory that the identifying technique downloaded computer code onto his computer. From what was disclosed, Mr. Mitrovich's expert found that the technique caused "download activity." R. 92 at 67-68, ¶ 9; *see also Kienast*, 907 F.3d at 526 (explaining that the NIT malware "could cause the user's computer to download that code."). The technique exploited a port known for malware attacks. R. 92 at 68, ¶ 10; *see also United States v. Knowles*, 207 F. Supp. 3d 585, 593-94 (D.S.C. 2016) (describing how NIT sent "computer instructions" to invade an "exploit" on users' devices). Even the technique's creator suggested it operated in this way. According to him, the technique tags computers with a "supercookie" before initiating a second phase that uses an "attack vector" to force them off the Tor. R. 92 at 31-34.

The source code or technical details would likely confirm that the identifying technique searched his computer much like the NIT malware. Just as the NIT was embedded into an illicit website, the identifying technique was embedded into the hyperlink. R. 97 at 5; *United States v. Hammond*, 263 F. Supp. 3d 826, 831 (N.D. Cal. 2016). Both methods "forced" computers to send identifying information to government servers. R. 53 at 2; R. 62-1 at 2; *United States v. Henderson*, 906 F.3d 1109, 1114 (9th Cir. 2018). Everything about the identifying technique mirrored the way NIT operated.

Thus, the information was favorable because it likely showed that the identifying technique constituted a search. *Henderson*, 906 F.3d at 1113 n.4 (holding that NIT conducted a search and collecting cases). If code was downloaded to his computer and

33

forced it to act, then—undeniably—it was a search. *See United States v. Werdene*, 883 F.3d 204, 214 n.7 (3rd Cir. 2018) ("The deployment of the NIT therefore constituted a 'search' under the Fourth Amendment" because it invaded "his home computer.").

### E.    There was a reasonable probability that the evidence would have been suppressed because the agents needed a warrant to conduct searches on American soil and the search was conducted unreasonably

All the evidence pointed to the identifying technique infecting Mr. Mitrovich's computer with some code and forcing it to unmask itself—*i.e.*, a Fourth Amendment search. In this context, the evidence is material when there is a reasonable probability that "the outcome of the motion to suppress" would have been different if Mr. Mitrovich had the source code or technical details. *Thomas*, 835 F.3d at 735; *see also Gamez-Orduno*, 235 F.3d at 462. Although burden on is Mr. Mitrovich, it "is less rigorous than a preponderance of the evidence standard." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) (cleaned up). This standard is met when, as here, the evidence supports his theory that an unlawful search occurred. *United States v. Johnathan Thomas*, 726 F.3d 1086, 1096-97 (9th Cir. 2013).

With the technical details in hand, there is a reasonable probability that the evidence flowing from this unlawful search—conducted in American—would have been suppressed. Not only did the Fourth Amendment apply to the Oceanian authorities under the joint venture doctrine, but so did the Warrant Clause because the technique invaded Mr. Mitrovich's computer on American soil. While the Warrant Clause does not generally apply to foreign searches even under the joint venture doctrine, that is true only when

they are *extraterritorial* searches. *Stokes*, 726 F.3d at 893 (explaining that the warrant clause does not apply "to extraterritorial searches[.]"); *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 171 n.9 (2d Cir. 2008) ("that the Warrant Clause has no extraterritorial application[.]"). But the actual search here was conducted where Mr. Mitrovich's computer was located—his home on American soil. *See Horton*, 863 F.3d at 1047-48 (finding the NIT search occurred in the defendants' homes where the program "was installed on [their] computers[.]").

The NIT cases make this point clear. In those cases, the government obtained warrants to deploy NIT from a server in Virginia. *Kienast*, 907 F.3d at 526. The actual search occurred where the computers were located because the program was downloaded onto those devices and forced them to send information to the investigators. *See Taylor*, 935 F.3d at 1285 ("It is undisputed, though, that the NIT warrant sought authority to search for information located outside the territorial confines of the Eastern District of Virginia."); *Horton*, 863 F.3d at 1047-48. As a result, most circuits found that Rule 41's jurisdictional requirement was violated because the NIT warrants authorized searches of computers located outside the jurisdiction. *Id.* at 1285-86; *see also Henderson*, 906 F.3d at 1113-14 (holding that NIT warrant authorized "a search outside" the jurisdiction); *Kienast*, 907 F.3d at 529 n.3 (collecting cases).

In the same way, the identifying technique conducted a search on American soil because the technique invaded his computer located in his home. The Fourth Amendment "draws a firm line at the entrance to the home." *Lange v. California*, 141 S. Ct. 2011, 2018 (2021). But the joint investigation crossed that line without a warrant. *Brigham*

35

*City v. Stuart*, 547 U.S. 398, 403 (2006) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").

Even if the Warrant Clause did not apply, there is still a reasonable probability that the search would have been suppressed because it was unreasonable. In the very least, the Fourth Amendment's reasonableness requirement applies to joint venture searches. *Stokes*, 726 F.3d at 893-94. And the agents must still execute the search in a reasonable manner. *Id*. Courts weigh the privacy intrusion against the government's need for the information. *Id*. In the joint venture context, courts also consider if the foreign law enforcement agents complied with their country's laws. *Id*.

The search here invoked the Fourth Amendment's core concern because it invaded into Mr. Mitrovich's home. *See, e.g., Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). The search also invaded his computer, his personal "effect." *United States v. Taylor*, 250 F. Supp. 3d 1215, 1227 (N.D. Ala. 2017) (explaining that the NIT infected the defendant's property "in a place whose protection lies at the heart of the Fourth Amendment," his home). Mr. Mitrovich therefore had a significant privacy interest. Of course, the government has a "strong interest in preventing" child sexual exploitation. *Stokes*, 726 F.3d at 893. That said, there are still limits. The sting operation lost sight of this interest. Not only did the operation allow for child abuse material to be shared for months, but it even used the material to employ its identifying technique.

In fact, the FBI and DOJ knew that the Oceanian authorities planned to

facilitate—and use—child abuse videos months before it happened. In July 2014, Task Force Argos agents told FBI agents that they planned to run the site in an undercover capacity, allowing users to distribute illicit material. R. 92 at 31-32. The Oceanian authorities then ran TLZ for months only to monitor users and build the joint investigation's database. *See* R. 96 at 5 (claiming that the undercover operation began in September and technique was deployed in November). The American authorities not only knew about this, but they supported and assisted the investigation.

The FBI knew that the Task Force Argos planned to leverage real child abuse videos. For instance, the agents designed the technique to offer a rotating basis of real child abuse material because they thought it would keep users more interested. R. 92 at 32. Courts have criticized tactics far less extreme. In the NIT cases, for example, one court found that the sting operation raised grave concerns even though users could not upload new material. *United States v. Anzalone*, 221 F. Supp. 3d 189, 194-95 (D. Mass. 2016) (finding it "troubling" that the decoy operation might have encouraged child abuse production). Other courts recognize that each act of child distribution results in harm even if done by law enforcement to identify criminals. *United States v. Chin*. 934 F.2d 393, 399 (2d Cir. 1991) (expressing "very serious concerns" in an undercover operation that encouraged child abuse "just so [the defendant] could be later arrested and prosecuted."). Yet, here, this did not stop the FBI. They kept participating in the operation knowing, for months, that this was going to happen.

Although the government claimed that the sting operation and technique were legal under Australian law, it offered nothing to support this claim. Instead, it provided a

handful of reports from American agents simply claiming it was lawful. R. 62-1 at 2; R. 65-1 at 2. But the government did not disclose any foreign issued warrants or court orders that authorized the sting operation or the identifying technique.

To sum up, there is a reasonable probability that the source code or technical details would support Mr. Mitrovich's theory that code was sent to his computer, forcing it to act in unauthorized ways. In turn, there is a reasonable probability that the evidence could have been suppressed because: 1) the identifying technique conducted a warrantless search on American soil; or 2) the search was constitutionally unreasonable. *Johnathan Thomas*, 726 F.3d at 1096-98 (vacating conviction when withheld discovery supported defendant's theory that there was no probable cause to search). Mr. Mitrovich thus met his burden under *Brady* to establish that material evidence was withheld.

### F.    The evidence should have been suppressed or the indictment dismissed under the court's supervisory powers because the agents acted with a reckless disregard for Mr. Mitrovich's ability to prepare a defense

The FBI agents knew that the technical details were vital to prosecutions and had an opportunity to learn the details. Yet they kept participating in the joint investigation knowing that defendants like Mr. Mitrovich would be denied access. Using its inherent supervisory powers, the district court should have suppressed the evidence or dismissed the indictment because the agents acted with a reckless disregard for Mr. Mitrovich's *Brady* and due process rights.

The courts' supervisory power allows them to dismiss indictments or exclude evidence when they perceive constitutional error. *See Elkins v. United States*, 364 U.S.

206, 216 (1960) (suppressing evidence obtained unlawfully by state investigators through its supervisory powers); *United States v. Hyder*, 732 F.2d 841, 843 (11th Cir. 1984) ("Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."). This power may be used to: 1) remedy a violation of a constitutional right; 2) preserve judicial integrity; and 3) deter future government misconduct. *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020). This Court has long held that it is proper to use this power to suppress evidence that was unlawfully seized. *Cortina*, 630 F.2d at 1214 (suppressing evidence through supervisory powers to prevent courts from becoming "accomplices in the willful disobedience of [the] Constitution[.]") (quotations omitted).

Courts can use this power to dismiss indictments when the government violates *Brady* and there is no less severe remedy. *United States v. Chapman*, 524 F.3d 1073, 1085-87 (9th Cir. 2008); *United States v. Lyons*, 352 F. Supp. 2d 1231, 1250-52 (M.D. Fla. 2004) (dismissing indictment based on *Brady* violations). To dismiss an indictment with prejudice, the defendant must show: 1) "flagrant misbehavior;" and 2) "substantial prejudice." *Bundy*, 968 F.3d at 1031. As explained above, Mr. Mitrovich suffered substantial prejudice because he was deprived of material evidence that likely would have supported his theory that a Fourth Amendment search occurred. *See id*. at 1033-37 (finding *Brady* violations substantially prejudiced defendants by depriving the defendants their right to "prepare their case fully[.]").

The government also displayed flagrant misconduct here because they were intimately involved in the investigation knowing that defendants would be denied access

to the critical details. Flagrant misconduct need not be intentional or deliberate. Instead, a "reckless disregard for the prosecution's constitutional obligations" satisfies this requirement. *Id.* at 1031 (cleaned up). During the sting operation, the agents knew that the technique's details were vital to prosecutions. *See*, *e.g.*, R. 92 at 76. For instance, the FBI and DOJ wanted more detailed information so that they could bring court proceedings against identified users in the United States. R. 92 at 76. In one email, an agent stated that the FBI "and DOJ just need to have a better understanding before we can start drafting warrants." R. 92 at 77.

Despite knowing that the information was crucial to criminal prosecutions, the government passed on the chance to learn the technical details. Months before the technique was used, the technique's developer offered to share the technical details with the FBI in exchange for some technical details about other FBI techniques. R. 92 at 72. But the FBI neglected to respond. R. 92 at 76. In an internal FBI email, agents discussed whether the FBI and DOJ would allow them to give the Oceanian authorities the NIT source code in exchange for technique's details. R. 92 at 72. Again, the FBI balked at the opportunity even though the NIT source code had leaked online and was *publicly available*. R. 92 at 72.

To this end, the district court declined to find a *Brady* or due process violation because there was no "government-imposed obstacle" to accessing the discovery. RSA:20-21; R. 114 at 8-9. But the government did prevent him from accessing the information: had it not refused the Oceanian agent's offer, it would have access to the details. *See*, *e.g.*, *United States v. McLellan*, 959 F.3d 442, 474-75 (1st Cir. 2020)

40

(explaining that the government violates the right to present evidence when an act or omission is attributable to the government which "actually or proximately caused" the evidence's absence). Instead, it chose to reap the benefits of the investigation without acting to ensure defendants would have access to evidence that was—in its own view—crucial to prosecutions. Even still, because Task Force Argos was part of the prosecution team, their conduct was imputed onto the government. *See Bundy*, 968 F.3d at 1037 (imputing the FBI's misconduct onto the prosecution team to find flagrant misconduct); *United States v. Lorefice*, 192 F.2d 647, 651-52 (7th Cir. 1999) ("From a legal standpoint, misconduct by the investigating law enforcement agents is indistinguishable from the misconduct by the prosecuting attorneys.").

In short, a remedy must fit the prejudice. The technical details likely supported that the technique conducted a warrantless search, leading to the evidence being suppressed. So the least severe remedy to cure this prejudice was to suppress the evidence. Still, dismissal of the indictment was warranted. The agents took part in a joint venture knowing all along that defendants would not have access to vital information. No other remedies sufficed.

## CONCLUSION

WHEREFORE, Defendant-Appellant Deny Mitrovich respectfully asks that this

Court vacate his conviction and remand the case to the district court to dismiss the

indictment, suppress the evidence, or enter any other relief this Court deems necessary.


Respectfully submitted,


/s Vadim A. Glozman
*Counsel for Deny Mitrovich*
VADIM A. GLOZMAN
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

/s Matthew P. Kralovec
*Counsel for Deny Mitrovich*
MATTHEW P. KRALOVEC
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

## RULE 32 CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 11,222 words, excluding the parts of the brief exempted by Red. R. App. P. 32(a)(7)(iii). This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using 12-point Century Supra in Microsoft Word for Windows 365.

Respectfully submitted,

/s Vadim A. Glozman
*Counsel for Deny Mitrovich*
VADIM A. GLOZMAN
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

/s Matthew P. Kralovec
*Counsel for Deny Mitrovich*
MATTHEW P. KRALOVEC
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

## CERTIFICATE OF SERVICE

I, Matthew P. Kralovec, hereby certify that I caused a true and accurate copy of the attached Opening Brief and Required Short Appendix of Defendant-Appellant Deny Mitrovich to be served on the government by electronically serving it through the CM/ECF system on May 1, 2023.

Respectfully submitted,

Matthew P. Kralovec

Date: **May 1, 2023**

/s Matthew P. Kralovec
Matthew P. Kralovec
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
P: (312)-726-9015
F: (312)-276-8040

# RULE 30(D) CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rule 30(d), we, Vadim A. Glozman and Matthew P. Kralovec,

counsel for Defendant-Appellant, state that the appendix submitted with this brief on

appeal incorporates the material required under Circuit Rule 30(a) and (b).

Respectfully submitted,

/s Vadim A. Glozman
*Counsel for Deny Mitrovich*
VADIM A. GLOZMAN
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

/s Matthew P. Kralovec
*Counsel for Deny Mitrovich*
MATTHEW P. KRALOVEC
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd. Suite, 1128
Chicago, IL 60604
P: 312-726-9015

No. 23-1010

# United States Court of Appeals
# For The Seventh Circuit

United States of America,

*Plaintiff-Appellee*,

vs.

Deny Mitrovich,

*Defendant-Appellant.*

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 18-CR-789
The Honorable Gary S. Feinerman

# Required Short Appendix For
# Defendant-Appellant Deny Mitrovich

Vadim A. Glozman
Matthew P. Kralovec
Law Offices of Vadim A. Glozman
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
P: (312)-726-9015
*Counsel for Deny Mitrovich*

# REQUIRED SHORT APPENDIX TABLE OF CONTENTS

R. 152, Deny Mitrovich Commitment and Judgment Order
　　　December 19, 2022 ............................................................RSA:1

R. 114, Memorandum Opinion and Order on Discovery Sanctions
　　　July 7, 2021 ....................................................................RSA:13

R. 73, Memorandum Opinion and Order Compelling Discovery
　　　April 30, 2020.................................................................. RSA:24

# UNITED STATES DISTRICT COURT
### Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| DENY MITROVICH | ) | Case Number:    1:18-CR-00789(1) |
| | ) | |
| | ) | USM Number:    53681-424 |
| | ) | |
| | ) | |
| | ) | Vadim A. Glozman |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count(s) Count One (1) of the Indictment.

☐ pleaded nolo contendere to count(s)        which was accepted by the court.

☐ was found guilty on count(s)        after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:2252A.F Activities Re Material Constituting/Containing Child Porno | 05/20/2015 | 1 |

The defendant is sentenced as provided in pages 2 through 9 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

December 19, 2022
Date of Imposition of Judgment

Signature of Judge

Gary Feinerman, United States District Judge
Name and Title of Judge

December 19, 2022

Date

A. 1

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Eighty-Four (84) Months as to Count One (1) of the Indictment.

☒       The court makes the following recommendations to the Bureau of Prisons: That the Defendant be designated to a facility as close as

possible to Chicago, Illinois, and that he be allowed to participate in a Residential Drug and Alcohol Treatment Program.

☐       The defendant is remanded to the custody of the United States Marshal.

☐       The defendant shall surrender to the United States Marshal for this district:

☐       at             on

☐       as notified by the United States Marshal.

☒       The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☒       before 2:00 pm on 1/17/2023.

☐       as notified by the United States Marshal.

☐       as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this
judgment.

_____
UNITED STATES MARSHAL


By _____
DEPUTY UNITED STATES MARSHAL

A. 2

Case: 1:18-cr-00789 Document #: 152 Filed: 12/19/22 Page 3 of 9 PageID #:755
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release   Case: 23-1010        Document: 15        Filed: 05/01/2023        Pages: 89    Judgment – Page 3 of 9

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

# MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Five (5) years as to Count One (1) of the Indictment.

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☒  (1)  you shall not commit another Federal, State, or local crime.
- ☒  (2)  you shall not unlawfully possess a controlled substance.
- ☐  (3)  you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence.  [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]
- ☒  (4)  you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).
- ☒  (5)  you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☒  (6)  you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.  [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

# DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a.**
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

- ☒  (1)  you shall provide financial support to any dependents if you are financially able to do so.
- ☐  (2)  you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐  (3)  you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:
- ☒  (4)  you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐  (5)  you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))
- ☒  (6)  you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
  - ☐  visit the following type of places:
  - ☐  knowingly meet or communicate with the following persons:
- ☒  (7)  you shall refrain from ☒ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐          ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.
- ☒  (8)  you shall not possess a firearm, destructive device, or other dangerous weapon.
- ☐  (9)  ☐  you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
  - ☐  you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
  - ☐  you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

A. 3

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                                          Judgment – Page 4 of 9

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)
.)

☐    (10)    (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ⬚ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ⬚ .

☐    (11)    (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ⬚ months.

☐    (12)    you shall work in community service for ⬚ hours as directed by a probation officer.

☐    (13)    you shall reside in the following place or area: ⬚ , or refrain from residing in a specified place or area: ⬚ .

☒    (14)    you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒    (15)    you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment.  You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒    (16)    ☒    you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified:    ,
         ☒ at home      ☒ at work      ☒ at school      ☒ at a community service location
         ☒ other reasonable location specified by a probation officer
         ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒    (17)    you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒    (18)    you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐    (19)    (home confinement)
         ☐    (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
         ☐    (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
         ☐    (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
         ☐    from the times directed by the probation officer; or ☐ from __ to __.
         ☐    (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
         ☐    (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐    (20)    you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐    (21)    (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations.  If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒    (22)    you shall satisfy such other special conditions as ordered below.

☒    (23)    You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

A. 4

Case: 1:18-cr-00789 Document #: 152 Filed: 12/19/22 Page 5 of 9 PageID #:757
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release Case: 23-1010    Document: 15    Filed: 05/01/2023    Pages: 89    Judgment – Page 5 of 9

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

□    (24)    Other:

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

□    (1)    if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

□    (2)    you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

□    (3)    you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least _____ hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed _____ hours.

□    (4)    you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

■    (5)    you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

■    (6)    you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

■    (7)    within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

■    (8)    you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

■    (9)    you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

■    You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

■    The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

■    You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

■    You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

■    You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

■    You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

□    This condition does not apply to your family members: _____ [Names]

A. 5

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

        ☒    Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

        ☒    You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

        ☒    You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒   (10)   you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings**.**

☒   (11)   you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐   (12)   you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐   (13)   if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐   (14)   You shall observe one Reentry Court session, as instructed by your probation officer.

☐   (15)   Other:_____

A. 6

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $67,500.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

Restitution of $67,500.00 to:

"ANGELA" Lenahan Law, PLLC
$3,000.00

"FIONA" Marsh Law Firm PLLC
$3,000.00

"JANE"  Marsh Law Firm PLLC
$6,000.00

"JENNY" Marsh Law Firm PLLC
$3,000.00

"MAUREEN" Deborah A. Blanco, P.S.
$5,000.00

"PIA" Deborah A. Blanco, P.S.
$10,000.00

CAROL L. HEPBURN IN TRUST FOR LILY
$10,000.00

CAROL L. HEPBURN IN TRUST FOR SIERRA
$3,000.00

CAROL L. HEPBURN IN TRUST FOR VIOLET
$11,500.00

SHERRI JACKSON – Tara Series
$10,000.00

UTAH CRIME VICTIMS LEGAL CLINIC IN TRUST FOR ANNA
$3,000.00

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**.  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

A. 7

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

☐    the interest requirement is waived for the          .

☐    the interest requirement for the          is modified as follows:

☐    The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A. 8

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                    Judgment – Page 9 of 9

DEFENDANT:  DENY MITROVICH
CASE NUMBER:  1:18-CR-00789(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payment of $100.00 due immediately.

      ☐  balance due not later than       , or

      ☒  balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g., months or years)*, to commence     *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $     over a period of     *(e.g., months or years)*, to commence     *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within     *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☒  Special instructions regarding the payment of criminal monetary penalties: you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States: See forfeiture order attached.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A. 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18 CR 789 |
| v. | ) | |
| | ) | Judge Gary S. Feinerman |
| DENY MITROVICH | ) | |

## PRELIMINARY ORDER OF FORFEITURE

The United States asks this Court to issue a preliminary order of forfeiture pursuant to Title 18, United States Code, Section 2253 and Federal Rules of Criminal Procedure 32.2.

(a)     On November 20, 2018, an indictment was returned charging DENY MITROVICH with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). The indictment sought forfeiture to the United States of property that was used, or intended to be used, to commit and to promote the commission of the charged offense.

(b)     On March 3, 2022, defendant DENY MITROVICH entered a voluntary plea of guilty to the indictment.

(c)     Pursuant to the terms of the plea agreement and as a result of his violation of 18 U.S.C. § 2252A(a)(5)(B), defendant DENY MITROVICH agreed that certain property, including but not limited to: (1) one Western Digital External Hard Drive, bearing serial number WCARW6062159, (2) one Hitachi Internal Hard Drive, bearing serial number HN07304A, and (3) one Western Digital Internal Hard Drive, bearing serial number WCASY1307751, is subject to forfeiture pursuant to the provisions of 18 U.S.C. § 2253.

(d)     Defendant DENY MITROVICH has agreed to the entry of a preliminary order of forfeiture relinquishing any right, title or interest he has in the foregoing property pursuant to 18 U.S.C. § 2253, for disposition according to law.

A. 10

(e)     The United States requests that this Court enter a preliminary order of forfeiture against defendant DENY MITROVICH as to: (1) one Western Digital External Hard Drive, bearing serial number WCARW6062159, (2) one Hitachi Internal Hard Drive, bearing serial number HN07304A, and (3) one Western Digital Internal Hard Drive, bearing serial number WCASY1307751, because the property was used, or intended to be used, to commit and to promote the commission of the offense of conviction.

(f)     Accordingly, this Court orders that a preliminary order of forfeiture be entered against defendant DENY MITROVICH as to the foregoing property.   Pursuant to 18 U.S.C. § 2253 and Fed. R. Crim. P. 32.2, all right, title, and interest of the defendant in the foregoing property named in this order shall be forfeited to the United States for disposition according to law.

(g)     Pursuant to 18 U.S.C. § 2253 and Fed. R. Crim. P. 32.2, the terms and conditions of this preliminary order of forfeiture shall be made part of the sentence imposed against the defendant and recited in any judgment and commitment order entered in the case.   In accordance with Rule 32.2(b)(4)(A), at sentencing-or at any time before sentencing if the defendant consents-the preliminary order of forfeiture, will become final as to the defendant.   Pursuant to Rule 32.2(c), if a third party files a petition asserting an interest in the property to be forfeited, this Court must hold a hearing to determine his rights.   Pursuant to 21 U.S.C. § 853(n)(2), as incorporated by 18 U.S.C. § 2253(b), third parties have 30 days from the publication of notice or receipt of notice, whichever is earlier, to file a petition.   The preliminary order of forfeiture will remain preliminary as to third parties until such an ancillary proceeding, if required, can be conducted under Rule 32.2(c).   After disposition of all third party interests, this Court shall, upon the

government's motion if appropriate, enter a final order of forfeiture for the property that is the subject of this preliminary order of forfeiture, thereby vesting clear title in the United States of America.

(h)     Pursuant to 21 U.S.C. § 853(g), as incorporated by 18 U.S.C. § 2253(b), and Fed. R. Crim. P. 32.2, upon entry of this preliminary order of forfeiture the foregoing property shall be seized by the Federal Bureau of Investigation.

(i)     This Court shall retain jurisdiction to take such additional action and enter such further orders as may be necessary to implement and enforce this preliminary forfeiture order.

_____
GARY S. FEINERMAN
United States District Judge


DATED:   12/19/2022

3

A. 12

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,             )
                                      )
                    Plaintiff,        )      18 CR 789
                                      )
        vs.                           )      Judge Gary Feinerman
                                      )
DENY MITROVICH,                       )
                                      )
                    Defendant.        )

<u>**MEMORANDUM OPINION AND ORDER**</u>

A grand jury charged Deny Mitrovich with knowingly possessing child pornography, in

violation of 18 U.S.C. § 2252A(a)(5)(B).  Doc. 1.  After denying Mitrovich's motion to dismiss

due to the Government's alleged delay in obtaining an indictment, Doc. 32 (reported at 2019 WL

1773358 (N.D. Ill. Apr. 23, 2019)), the court granted Mitrovich's motion to compel the

Government to respond to two interrogatories, Docs. 72-73 (reported at 458 F. Supp. 3d 961

(N.D. Ill. 2020)).  Dissatisfied with the Government's efforts to comply with that order,

Mitrovich moves the court to impose a discovery sanction, either in the form of the suppression

of evidence or outright dismissal of the charges.  Doc. 92 at 2.  Mitrovich also argues that the

Government's failure to produce the evidence in question denies him his due process right to put

on a defense and violates the Government's duties under *Brady v. Maryland*, 373 U.S. 83 (1963).

Doc. 92 at 15-26.  The motion is denied.

**Background**

The relevant background is detailed in the opinion granting Mitrovich's motion to

compel.  458 F. Supp. 3d at 963-64.  In short, law enforcement authorities in Australia and New

Zealand clandestinely took control of a website called "The Love Zone," which was known to

A. 13

host child pornography. *Id*. at 963. The website was accessible only through the anonymizing

web browser Tor, which hindered efforts to trace users' IP addresses. *Ibid*. The Oceanian

authorities developed a workaround, though: they posted to the site a URL that linked to a child

pornography video, but clicking the URL would start the download *outside* the Tor browser,

allowing the user's IP address to be discovered. *Ibid*. Mitrovich clicked on the URL, revealing

his true IP address. *Ibid*. Because the IP address was associated with an internet connection in

the United States, the Oceanian authorities shared it with authorities in this country, who traced it

to Mitrovich's residential address. *Ibid*. Federal law enforcement officers then obtained a

warrant, searched Mitrovich's residence, and uncovered child pornography on his electronic

devices. *Ibid*.

Mitrovich sought Criminal Rule 16 discovery from the Government concerning the

technique used by the Oceanian authorities to uncover his IP address. *Id*. at 964. According to

Mitrovich, that discovery would allow him to develop an argument that the technique constituted

a Fourth Amendment search—one occurring without a warrant—and thus that all evidence

attributable to the revealing of his IP address must be suppressed. *See ibid*. The Government

objected to Mitrovich's discovery request as immaterial, so he moved to compel. *Ibid*. The key

issue was whether Rule 16(a)(1)(E) required disclosure of the details of the unmasking

technique. *Ibid*.; *see* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring the Government to produce

evidence "within [its] possession, custody, or control" that "is material to preparing the

defense").

Mitrovich's motion to compel turned on two questions. The first was "whether the

investigative tools used to identify his IP address potentially effected a search within the

meaning of the Fourth Amendment." 458 F. Supp. 3d at 964-65. The second was whether the

first question mattered for purposes of the exclusionary rule—that is, whether the Oceanian authorities' conduct could be attributable to federal authorities in the United States, and thus be subject to the Fourth Amendment's exclusionary rule, under the "joint venture" doctrine. *Ibid.*; *see id.* at 965 ("'Evidence obtained in a search of an American citizen by foreign authorities operating within their own country is generally admissible in the courts of the United States even if the search does not otherwise comply with ... the Fourth Amendment.' Under the joint venture doctrine, however, 'if U.S. agents substantially participate in an extraterritorial search of a U.S. citizen and the foreign officials were essentially acting as agents for their American counterparts or the search amounted to a joint operation between American and foreign authorities, the Fourth Amendment generally applies.'") (alteration in original) (citation omitted) (quoting *United States v. Stokes*, 726 F.3d 880, 890-91 (7th Cir. 2013)). As this court observed: "If the answer to either question is no, then any Fourth Amendment motion to suppress would be dead in the water, meaning that the discovery Mitrovich seeks would not be material, which in turn means that his motion must be denied. If the answer to both questions is yes, then the discovery is material and Mitrovich's motion must be granted." *Id.* at 965.

The court sided with Mitrovich, at least to the extent necessary to grant his motion. First, the court held that he "ha[d] made 'at least a *prima facie* showing' that the joint venture doctrine applies," such that it could not reject outright the possibility that the exclusionary rule would require suppression of evidence obtained in a manner that violated the Fourth Amendment. *Id.* at 965-66 (quoting *United States v. Thompson*, 944 F.2d 1331, 1341 (7th Cir. 1991)). Second, the court held that Mitrovich "ha[d] made 'at least a *prima facie* showing' that malware was used to obtain his IP address" and that such use could qualify as a Fourth Amendment search. *Id.* at 967 (quoting *Thompson*, 944 F.2d at 1341). Given those showings, the court concluded that

A. 15

Mitrovich's discovery requests were material to a potential Fourth Amendment suppression motion. It therefore ordered the Government to "produce discovery responsive to [the challenged interrogatories], subject to any targeted objections to the production of specific material." *Ibid*. The court concluded by noting the narrowness of its order: "By this ruling, the court holds only that Mitrovich has made a *prima facie* showing that the discovery is material to a Fourth Amendment motion to suppress that he might file; this ruling does not speak to the ultimate merits of any such motion." *Ibid*.

Long before Mitrovich's motion to compel, federal authorities sought to learn the technical details of the unmasking technique used by the Oceanian authorities. Doc. 96 at 8-13. But the information the federal authorities received was not of much use. In 2014, New Zealander authorities provided an "'overview'" of the technique but declined to "'disclose the specific methodologies used.'" *Id*. at 11-12 (quoting emails from New Zealand law enforcement). Those authorities rebuffed attempts by federal authorities to follow up and learn more details. *Id*. at 12-13.

After the court's ruling, the Government renewed its efforts to obtain the pertinent software and/or source code from the Oceanian authorities. *Id*. at 13 n.6. Those efforts, too, were largely unsuccessful. While the Government obtained some vagaries about the technique from a former New Zealand law enforcement official, it was unable to obtain the details it sought, as New Zealander law barred him from disclosing those details. *Id*. at 13 & nn.5-6. So, while the Government has turned over everything in its possession relating to the technical details of how the Oceanian authorities identified Mitrovich's IP address, Doc. 92 at 3-6; Doc. 96 at 13, it has been unable to obtain the software and/or source code that would reveal precisely *how* the URL caused users' IP addresses to become unmasked, Doc. 96 at 13.

**Discussion**

Mitrovich views the Government's failure to turn over the requested software or source code as a violation of the court's ruling on his motion to compel, and therefore moves for discovery sanctions. *Id*. at 1, 8-15. Specifically, he asks that the court suppress all evidence that was obtained as a result of Mitrovich clicking on the URL or, in the alternative, dismiss the charges outright. *Id*. at 1, 9, 26-27. In addition, Mitrovich contends that the Government's failure to turn over the software or source code implicates his constitutional rights—either as a violation of his due process right to put on a defense, or of the Government's obligations under *Brady*. *Id*. at 15-26. The Government submits that it has satisfied its obligations under Rule 16, the court's discovery order, and the Constitution by turning over everything that it has and by making good faith (albeit unsuccessful) efforts to obtain more. Doc. 96.

## I.     Criminal Rule 16 and the Court's Discovery Order

Mitrovich first argues that sanctions are warranted because the Government, by failing to produce the software or source code used by the Oceanian authorities to reveal his IP address, flouted the court's order granting his motion to compel. Doc. 92 at 6-15. In so arguing, Mitrovich misunderstands the court's order.

To reiterate: The dispute giving rise to Mitrovich's motion to compel centered on two interrogatories Mitrovich served on the Government, each concerning the technique used by the Oceanian authorities to unmask his IP address. 458 F. Supp. 3d at 964. The Government objected, arguing that the discovery was not material to any Fourth Amendment challenge he might raise, either because the use of the Tor-evading URL did not constitute a Fourth Amendment search or because, even if it did, the resulting Fourth Amendment violation was committed by foreign authorities and thus could not be the basis for suppressing evidence. *Ibid*. The court rejected those arguments, holding that in order to obtain discovery, Mitrovich needed

A. 17

only to make *prima facie* showings that there was a Fourth Amendment search and that federal

law enforcement authorities' involvement in the Oceanian authorities' investigation was

sufficient to implicate the exclusionary rule, and that he had made those showings. *Id.* at 965-67.

In other words, the court held that the requested discovery *was* material within the meaning of

Rule 16, and thus that the Government was obligated to substantively respond to the two

interrogatories.

That was as far as the court went. The court did not, as Mitrovich suggests, order the

Government to turn over any specific materials. *Id.* at 967 ("The Government shall produce

discovery responsive to [the two] Requests … , *subject to any targeted objections to the*

*production of specific material*.") (emphasis added). And had Mitrovich asked for such an order

at the time, the court would have clarified then—as it clearly states now—that the Government

has no obligation to turn over materials that it does not have and cannot obtain through good

faith, diligent efforts. *See* Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment

("[T]he government's obligation is limited to production of items within the possession, custody

or control of the government, the existence of which is known, or by the exercise of due

diligence may become known, to the attorney for the government."). As the Rule itself puts it,

the Government's discovery obligation is to turn over materials that are "within [its] possession,

custody, or control." Fed. R. Crim. P. 16(a)(1)(E); *see United States v. Lee*, 723 F.3d 134, 141

(2d Cir. 2013) (explaining that the defendant was not entitled to the documents he sought

"because these materials were not … within the 'government's possession, custody, or control'")

(quoting Fed. R. Crim. P. 16(a)(1)(E)); *United States v. Dillow*, 980 F. Supp. 2d 879, 881-82

(N.D. Ohio 2013) ("[D]oes the 'government' have 'custody' in the Rule 16 sense of items

apparently possessed only by a [different] law enforcement agency? … [T]he weight of authority

… indicates the answer to that question is 'No.'") (citing *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998); *United States v. Brazel*, 102 F.3d 1120, 1150 (11th Cir. 1997); and *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1375 (9th Cir. 1987)). It follows that where the Government does not possess the requested materials but has tried diligently (though unsuccessfully) to obtain them, it has not violated Rule 16.

Mitrovich does not dispute that the Government has made efforts to learn additional details about the technique used by the Oceanian authorities to uncover his IP address, or that the Government has turned over everything it knows about that technique. Indeed, Mitrovich himself concedes that "[t]h[e] uncertain[t]y about the functionality of the hyperlink is shared by the government and FBI," and that the Government has made efforts "to obtain more detailed information about the [Tor-evading] technique" from New Zealander law enforcement and from the former New Zealander official. Doc. 92 at 5 (quoting *id.* at 71). As far as the Government's Rule 16 discovery obligations go, there is nothing left to be done. The Government must turn over what it possesses, but it cannot be faulted under Rule 16 for not turning over materials that it tried but was unable to obtain.

The court understands that, without the software or source code in hand, Mitrovich may find it difficult to mount a compelling Fourth Amendment suppression motion. But that is not the Government's fault, and there is thus no legitimate basis for the Rule 16 discovery sanctions he seeks.

## II.    Due Process Right to Mount a Defense and *Brady*

The analysis differs somewhat when it comes to Mitrovich's constitutional arguments. Mitrovich does not claim a due process right (beyond what Rule 16 provides) to obtain evidence that would assist him in pressing a Fourth Amendment motion to suppress, nor does he argue that the Government's *Brady* duties extend to material relevant only to a Fourth Amendment

A. 19

claim.  Rather, Mitrovich's due process arguments relate to his ability to defend against the

charges on the merits.  *Id*. at 13-15.  And Mitrovich's theory of why the software and source

code are relevant to the merits appears to be this: He would admit at trial to clicking the URL,

and would argue that doing so rendered his computer vulnerable to external attacks that caused

child pornography to appear on his computer even though he never downloaded or knew about

that material.  *Id*. at 13-14 & nn.6-7.

Mitrovich first contends that without the source code, he is deprived of the opportunity to

put on this defense, thereby rendering his prosecution fundamentally unfair, in violation of due

process.  Doc. 92 at 17-18; *see Fieldman v. Brannon*, 969 F.3d 792, 800 (7th Cir. 2020)

(discussing a defendant's due process "right to a 'meaningful opportunity to present a complete

defense'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  That claim fails, even

assuming those materials might provide some realistic avenue toward acquittal.

True enough, a criminal defendant has the right (whether grounded in the Fifth or Sixth

Amendment) to put on a defense.  *See Crane*, 476 U.S. at 690.  But that does not mean that a

constitutional violation occurs every time the Government prosecutes a defendant who is unable

to obtain potentially exculpatory evidence.  Sometimes, through nobody's fault, evidence is

simply unavailable—for example, the defendant's lone alibi witness may die before giving a

statement, or a video recording of the alleged crime may be accidentally deleted.  As Mitrovich

concedes, the unavailability of the evidence he seeks is not the Government's fault, as the

Oceanian authorities are simply unwilling to share it.  There is thus no Government-imposed

obstacle to Mitrovich's ability to put on a defense, and therefore no violation of his due process

right to put on a defense.  Mitrovich's argument is thus a mismatch for the due process right to

put on a defense, and sounds more in the register of a *Brady* claim.  It is the *Brady* right, also

A. 20

sounding in due process, that provides that when the Government possesses exculpatory

material, it must turn that material over to the defendant.  *See United States v. Roberts*, 534 F.3d

560, 572 (7th Cir. 2008) ("Under *Brady*, the Government has the obligation to disclose any

evidence in its possession that is both material and favorable to a defendant.").

Mitrovich's *Brady* argument, though, fails as well.  Mitrovich has much to say about the

importance of a prosecutor complying with her *Brady* obligations and how fundamental *Brady* is

to a fair system of criminal justice.  Doc. 92 at 18-20, 25-26.  Those points are valid as far as

they go, but Mitrovich overlooks the fact that a *Brady* duty arises only when the Government has

in its possession "favorable" evidence, in the sense of being "either exculpatory or impeaching,"

that is "material to the defense."  *United States v. King*, 910 F.3d 320, 326 (7th Cir. 2018)

(Barrett, J.) (internal quotation marks omitted).  It is the defendant's burden to offer more than

mere speculation that the undisclosed evidence in question is exculpatory and material.  *See*

*United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992) ("Mere speculation that a

government file may contain *Brady* material is not sufficient … .  A due process standard which

is satisfied by mere speculation would convert *Brady* into a discovery device and impose an

undue burden upon the district court.") (quoting *United States v. Navarro*, 737 F.2d 625, 631

(7th Cir. 1984)).

A logically anterior question is whether, for *Brady* purposes, the United States possesses

the source code Mitrovich seeks.  That question is more complicated than it appears, for the

answer may turn on the extent to which the investigation that led to Mitrovich's arrest was a joint

one between federal and Oceanian authorities.  *See United States v. Morris*, 80 F.3d 1151, 1169

(7th Cir. 1996) (explaining that the Government's *Brady* duty to produce exculpatory evidence

extends to "information possessed by other government agencies that have … involvement in the

investigation or prosecution at issue").  The parties seem to agree that the court would need an evidentiary hearing to make a finding on that front.  Doc. 96 at 2; Doc. 97 at 14.  For purposes of evaluating Mitrovich's *Brady* claim, then, the court assumes without deciding that the United States constructively possesses the source code he seeks.

Mitrovich's *Brady* argument still fails because he cannot offer anything more than speculation that the evidence in question is exculpatory.  Mitrovich offers some technical authority suggesting that it is *possible* that when a person's computer is infected with malware, other people may be able to store contraband on the computer's drives without the owner's knowledge.  Doc. 92 at 14 nn.6-7.  Yet he offers nothing even remotely suggesting that this might have happened here.  Of course, the overview provided by the Oceanian authorities of its investigative techniques may be too vague to allow anyone—either the Government or Mitrovich's expert—to understand every detail of how the URL worked.  But that does not relieve Mitrovich of his burden to show that the evidence he seeks is exculpatory.

Mitrovich's *Brady* argument also falters on the materiality prong.  *Brady* requires the prosecution to turn over evidence only if it is "material," meaning only if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018) (quoting *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017)).  By its terms, the materiality analysis assumes a post-"proceeding" vantage point, so it can be difficult for a defendant to demonstrate from an *ex ante* lens that a particular piece of evidence is material.  *See United States v. Heine*, 314 F.R.D. 498, 503-04 (D. Or. 2016) (discussing the difficulty of conducting a *Brady* materiality analysis before trial); *United States v. Acosta*, 357 F. Supp. 3d 1228, 1233 (D. Nev. 2005) (noting that under the "cumulative 'materiality' standard" of *United States v. Bagley*, 473 U.S.

A. 22

667 (1985), "it becomes extremely difficult if not impossible to discern before trial what combination of evidence will be deemed 'material' after trial under *Brady*"); *see also United States v. Pesaturo*, 519 F. Supp. 2d 177, 189 n.7 (D. Mass. 2007) ("Trial courts considering materiality under *Brady* have identified a difficulty applying [the materiality standard], crafted in the post-trial appellate context, to the pretrial discovery setting."). The difficulty faced by Mitrovich is significantly exacerbated by the fancifulness of his proposed defense theory. It is hard to see how the evidence Mitrovich seeks could have any effect on a jury. So, to find materiality, the court would need to carefully evaluate the theory in light of all the evidence presented by the Government to support Mitrovich's guilt.

The court cannot do that before trial. At this juncture, then, the court must turn away Mitrovich's *Brady* claim, though he will of course be allowed to reassert it later in the case, assuming he can then also make a showing that the evidence is exculpatory. In so holding, the court does not suggest that a defendant can *never* lodge a successful *Brady* claim before trial, but only that it will generally be more difficult before trial for the defendant to show materiality, and that Mitrovich has failed to do so here. The court acknowledges and expresses its disagreement with *United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005), which suggests that a court can ignore materiality when a defendant presses a *Brady* claim before trial.

### Conclusion

Mitrovich's motion for discovery sanctions is denied.

July 7, 2021

_____

United States District Judge

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 18 CR 789 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DENY MITROVICH, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

A grand jury charged Deny Mitrovich with knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Doc. 1. The court denied Mitrovich's motion to dismiss, which focused on the delay between his arrest and indictment. Doc. 32 (reported at 2019 WL 1773358 (N.D. Ill. Apr. 23, 2019)). Mitrovich now moves to compel the Government to produce discovery concerning the investigative tools used to identify the true IP address of a visitor to a child pornography website—who, by his own admission, was Mitrovich, Doc. 48 at 1, 15; Doc. 56 at 1-2, 4-5, 8-9, 18, 20; Doc. 65 at 2-3, 15-16—despite his use of Tor. Doc. 48. The motion is granted.

## Background

Tor—an acronym for "The Onion Router"—is software that allows a computer user to conceal his IP address and location by relaying his internet traffic through the Tor network. Doc. 48 at 2, 12-13; Doc. 56 at 3-6. Tor protects user privacy by passing encrypted data through at least three different servers in the Tor network before sending it to its destination. Doc. 56 at 3 & n.1 (citing *Tor: Overview*, Tor, https://2019.www.torproject.org/about/overview.html.en (last visited Apr. 29, 2020)); *Tor FAQ*, Tor, https://2019.www.torproject.org/docs/faq.html.en (last

visited Apr. 29, 2020); *United States v. Kienast*, 907 F.3d 522, 526 (7th Cir. 2018) ("The Tor software makes user information untraceable by relaying it through a series of interconnected computers."). Tor Browser is a version of Firefox that deploys additional protections to conceal a user's IP address and other identifying information. Doc. 56 at 4-5 & n.3 (citing *Tor FAQ*, *supra*). "Tor has plenty of legitimate uses—think military and law-enforcement officers carrying out investigations, journalists seeking to maintain anonymity, and ordinary citizens researching embarrassing topics. As [one] can imagine, Tor has spawned—and effectively enables—a cache of unsavory sites for black-market trading, child-pornography file-sharing, and other criminal enterprises." *United States v. Taylor*, 935 F.3d 1279, 1282-83 (11th Cir. 2019).

In 2014, the Federal Bureau of Investigation ("FBI") began investigating The Love Zone ("TLZ"), a website that allowed users to advertise and distribute child pornography. Doc. 48 at 1-2; Doc. 65-1 at 1. "In mid-2014, the FBI, MCCU, obtained the ability to identify IP addresses associated with" TLZ, and those addresses "revealed that 'TLZ' was hosted in The Netherlands, with the head administrator residing in Australia." Doc. 65-1 at 1-2; Doc. 48 at 2; *see* Doc. 62 at 8. (MCCU is the former name of the FBI component now called the Child Exploitation Operations Unit. Doc. 62 at 4 n.4.) After the FBI shared that information with Australian authorities, the Queensland Police Service ("QPS") in Australia and the Department of Internal Affairs ("DIA") in New Zealand seized control of TLZ and operated it undercover for several months. Doc. 48 at 2. QPS/DIA arrested a TLZ user, who provided a backup copy of TLZ that included information on user accounts, posts, and messages—including those of a user called "cyberguy"—and QPS/DIA shared that information with the FBI. *Ibid.*

As part of its investigation, QPS/DIA uploaded a hyperlink on TLZ that advertised a child pornography video. Doc. 48 at 3; Doc. 53 at 1-2. According to QPS/DIA, when a TLZ

user clicked on that hyperlink, he was advised that he was attempting to open a file from an external website. Doc. 48 at 3; Doc. 53 at 2. If the user played the file, QPS/DIA could capture his IP address even if it otherwise would have been concealed by Tor. Doc. 48 at 3; Doc. 53 at 2. "Cyberguy" opened the hyperlink and QPS/DIA captured his IP address. Doc. 48 at 3.

Because the IP address indicated that "cyberguy" was located in the United States, Doc. 62 at 8, QPS/DIA provided the lead to the FBI, Doc. 53 at 1. The FBI in turn obtained records from Comcast providing the physical address associated with the IP address. Doc. 48 at 3; Doc. 65-1 at 4. The Government obtained and executed a search warrant for the physical address—Mitrovich's home—and found child pornography videos and photographs stored on hard drives. Doc. 48 at 3-4; Doc. 53 at 1.

As noted, Mitrovich was indicted for possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Doc. 1. In an effort to obtain information to support a Fourth Amendment challenge to the means used to discover his IP address, Mitrovich served these Criminal Rule 16(a)(1)(E) discovery requests on the Government:

> 4. Any and all discovery relating to the FBI and MCCU['s] "ability to identify IP addresse[s] associated with certain users of TorChat and certain hidden services" as referenced on MITRO_00001. This includes but [is] not limited to the name of the software used, any and all manuals related to the software, logs kept throughout [the] course of [the] investigation, all training materials, including but not limited to training records, certification records, training standards, and training manuals, all policies and procedures regarding use of this software, names and curriculum vitae of any and all individuals who operated [the software], and any and all records utilized by [the] FBI and MCCU during [the] course of this investigation as it relates to this software; and,
>
> 5. Any and all communications between the FBI/MCCU and QPS and DIA throughout Operation Downfall II, as referenced on MITRO_00001-00002, including email communications, letters, and any and all attachments including the reports generated of each user through [the] TLZ sting that were "generated by QPS/DIA and provided to the MCCU for further identification."

Doc. 48 at 4; Doc. 62 at 1-2.  The Government responded:

> We will not produce materials in response to #4 because that quoted reference
> pertains to Operation Downfall Part 1 and is not related to Mitrovich, whose
> IP address was not obtained in that manner.  (His IP address was obtained in
> Operation Downfall Part 2, when QPS/DIA was operating TLZ in an
> undercover capacity.)
>
> We will also not produce any materials in response to #5.  Even assuming the
> US government were accountable for the conduct of QPS/DIA (which we
> dispute), the investigative use of a URL to reveal Mitrovich's true IP address
> could not have violated the [F]ourth [A]mendment.  Among other reasons,
> Mitrovich had no reasonable expectation of privacy regarding his true IP
> address when he clicked the URL on TLZ.  As a result, discovery pertaining
> to the relationship between the US and QPS/DIA is not material to the
> defense, or otherwise discoverable.

Doc. 48 at 5.  Mitrovich clarified that Request 4 referred to the software used to direct users from

Tor to the external website with the child pornography video file, Doc 48 at 5; Doc. 62 at 1 n.1,

but the Government adhered to its objection, Doc. 48 at 5.

### Discussion

Mitrovich moves to compel the Government to produce discovery responsive to Requests

4 and 5, arguing that the investigative tools used to reveal his true IP address may have violated

the Fourth Amendment, and therefore that *Brady v. Maryland*, 373 U.S. 83 (1963), and Rule

16(a)(1)(E) require disclosure of the requested information to allow him "to properly investigate

and research his ability to litigate a motion to suppress."  Doc. 48 at 1, 5-17; Doc. 56 at 1-3.

Rule 16(a)(1)(E) imposes on Mitrovich the burden to "make at least a *prima facie* showing that

the requested items are material to his defense."  *United States v. Thompson*, 944 F.2d 1331,

1341 (7th Cir. 1991); *see also United States v. Kohli*, 847 F.3d 483, 493 (7th Cir. 2017).  The

parties agree that two issues are central to the materiality question: (1) whether the exclusionary

rule potentially applies to the conduct of the foreign law enforcement agencies that obtained

Mitrovich's IP address; and (2) whether the investigative tools used to identify his IP address

4

A. 27

potentially effected a search within the meaning of the Fourth Amendment.  If the answer to

either question is no, then any Fourth Amendment motion to suppress would be dead in the

water, meaning that the discovery Mitrovich seeks would not be material, which in turn means

that his motion must be denied.  If the answer to both questions is yes, then the discovery is

material and Mitrovich's motion must be granted.

### A.     Foreign Law Enforcement

As to the first disputed issue, the Government contends that the exclusionary rule does

not provide a remedy for any action taken by QPS/DIA in the investigation of TLZ and

Mitrovich.  Doc. 62 at 6-9.  "Evidence obtained in a search of an American citizen by foreign

authorities operating within their own country is generally admissible in the courts of the United

States even if the search does not otherwise comply with … the Fourth Amendment."  *United

States v. Stokes*, 726 F.3d 880, 890 (7th Cir. 2013).  Under the joint venture doctrine, however,

"if U.S. agents substantially participate in an extraterritorial search of a U.S citizen and the

foreign officials were essentially acting as agents for their American counterparts or the search

amounted to a joint operation between American and foreign authorities, the Fourth Amendment

generally applies."  *Id*. at 890-91.

Citing a March 2015 FBI memorandum concerning the investigation of "cyberguy,"

Mitrovich argues that the FBI's own description of its cooperation with QPS/DIA shows that the

joint venture doctrine applies.  Doc. 65 at 2-8; Doc. 65-1.  The memorandum reports that the FBI

"initiated Operation Downfall II to target [certain] websites," including TLZ, that the FBI

"obtained the ability to identify IP addresses associated with … hidden services," including TLZ,

and that QPS/DIA acted "[p]ursuant to [that] information."  Doc. 65 at 2 (quoting Doc. 65-1 at 1-

3).  The memorandum adds that QPS/DIA provided the FBI with reports for each TLZ user that

accessed the external child pornography video from an IP address within the United States, that QPS/DIA also provided backup copies of TLZ that contained all user activity on the site, and that the FBI entered the data in a database. Doc. 65-1 at 2-3. Given all this, Mitrovich asserts, the FBI was "working together with foreign law enforcement" in a manner potentially qualifying as a joint venture under *Stokes*. Doc. 65 at 2-5.

The Government counters with the report of an interview that the prosecution team conducted in March 2020—after Mitrovich filed his reply brief in support of the present motion—of FBI Supervisory Special Agent Brooke Donahue. Doc 62 at 4; Doc. 62-1. According to the Government, Special Agent Donahue's description of the TLZ investigation "demonstrate[s] there was no joint venture between the FBI and QPS/DIA," but rather "an arm's length relationship between the FBI and foreign law enforcement authorities that involved deconfliction and lead sharing." Doc. 62 at 7-9. This argument fails at this juncture, where the court must apply the standard governing motions to compel. As the Government acknowledges, "whether the joint venture doctrine is satisfied presents a factually based issue that involves applying a legal label to a complex set of facts." *Id.* at 6 (internal quotation marks omitted) (quoting *United States v. Agosto-Pacheco*, 2019 WL 4566956, at *5 (D.P.R. Sept. 20, 2019)). Because the FBI's contemporaneous March 2015 memorandum makes plausible Mitrovich's submission that there was a joint operation between the FBI and QPS/DIA in connection with the TLZ investigation, he has made "at least a *prima facie* showing" that the joint venture doctrine applies. *Thompson*, 944 F.2d at 1341. It follows that Mitrovich's motion to compel cannot be denied based on the Government's submission that the exclusionary rule does not apply to the investigatory conduct of QPS/DIA in this case.

A. 29

**B.    Possible Use of Malware**

As to the second disputed issue, Mitrovich contends that the discovery he seeks would allow him to show that his IP address was captured through the installation of malware on his computer, thereby violating the Fourth Amendment.  Doc. 56 at 1-2, 7-18; Doc. 65 at 12-17. (For present purposes, the court adopts the Government's broad understanding of Mitrovich's reference to "malware," Doc. 62 at 5 ("QPS/DIA's technique did not involve hacking, using/inserting malware, or using escalated privileges on a user's computer."), which extends beyond the use of a "malicious" bug or virus.  *See United States v. Tagg*, 886 F.3d 579, 583 n.2 (6th Cir. 2018) (calling the FBI's technique in that case a "benevolent virus").)  The Government does not dispute that the installation of malware on Mitrovich's computer—if it occurred— would have effected a Fourth Amendment search.  *See id.* at 584 ("[T]o identify [the website's] users, the FBI had to place a digital bug in the fabric of the website. … [T]his act counts as a Fourth Amendment 'search' of the user's home computer … ."); *United States v. Horton*, 863 F.3d 1041, 1047 (8th Cir. 2017) (holding that the FBI's sending "computer code to the defendants' respective computers that searched those computers for specific information and sent that information back to law enforcement" was a Fourth Amendment search that "required a warrant"); *United States v. Darby*, 190 F. Supp. 3d 520, 530 (E.D. Va. 2016) (holding that because "[t]he NIT ["Network Investigative Technique"] in this case caused Defendant's computer to download certain code without the authorization or knowledge of Defendant," the Government "invaded the contents of the computer" and its "deployment of the NIT was a Fourth Amendment search"), *aff'd*, 721 F. App'x 304 (4th Cir. 2018).

The Government maintains, however, that QPS/DIA did not deploy malware to discover Mitrovich's true IP address.  Doc. 53 at 2 ("QPS/DIA explained that it was able to capture the IP

address by configuring the video file to open an internet connection outside of Tor, thereby allowing QPS/DIA to capture the user's actual IP address, as well as a session identifier that tied the IP address to the activity of a particular TLZ user account."); Doc. 62 at 4 ("[T]he technique … did not involve downloading malware onto [Mitrovich's] computer or otherwise invading the property of his computer."); *id*. at 4-5 (citing Special Agent Donahue's representation during his March 2020 interview that, while he "does not know the 'minute details' of the technique used by QPS/DIA," he "is familiar with what [it] entailed … based on communications he had with Australian/New Zealand law enforcement personnel," and that "there was no information collected from inside the user's computers").  Mitrovich counters that "because of the way the Tor Network and Tor Browser operates, the hyperlink [to the external child pornography video file] must have contained malware that forced [his] computer to send the identifying information to QPS/DIA or forced it to exit from the Tor Browser and onto the open internet."  Doc. 56 at 1. According to Mitrovich, the FBI's use of malware to discover IP addresses in other investigations, *see Taylor*, 935 F.3d at 1283 ("As a means of ferreting out [child pornography website] visitors whose identities were masked by Tor, the FBI sought to deploy government-created malware—specifically, a computer code called the Network Investigative Technique ('NIT')—that would transmit user information back to the FBI."), makes it likely that malware was used here as well.  Doc. 56 at 7-12.  Mitrovich adds that the ability of law enforcement to remove malware from a computer in a manner that prevents a forensic analysis of the computer from revealing its use makes the discovery he seeks the only way to determine whether QPS/DIA in fact used malware.  *Id*. at 12-15.

As with his submission that the FBI's cooperation with QPS/DIA potentially calls into play the joint venture doctrine, Mitrovich has made "at least a *prima facie* showing" that

malware was used to obtain his IP address. *Thompson*, 944 F.2d at 1341. It follows that his motion to compel cannot be denied based on the Government's assertion—which rests on second-hand information from QPS/DIA—that malware was not used and therefore that no Fourth Amendment search occurred. *See United States v. Budziak*, 697 F.3d 1105, 1112-13 (9th Cir. 2012) (holding that it was "an abuse of discretion for the district court to deny [the defendant] discovery on the EP2P program," reasoning that "criminal defendants should not have to rely solely on the government's word that further discovery is unnecessary[,] … especially … where … a charge against the defendant is predicated largely on computer software functioning in the manner described by the government, and the government is the only party with access to that software").

### Conclusion

Mitrovich's motion to compel is granted. The Government shall produce discovery responsive to Requests 4 and 5 by May 28, 2020, subject to any targeted objections to the production of specific material. By this ruling, the court holds only that Mitrovich has made a *prima facie* showing that the discovery is material to a Fourth Amendment motion to suppress that he might file; this ruling does not speak to the ultimate merits of any such motion.

April 30, 2020

_____
United States District Judge

A. 32