In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

## No. 23-1010

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**DENY MITROVICH,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 18 CR 789 — Gary Feinerman, *Judge.*

## BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

ALEXANDRA MORGAN
Assistant United States Attorney

BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUE PRESENTED FOR REVIEW .................................................. 1

STATEMENT OF THE CASE .......................................................... 1

SUMMARY OF ARGUMENT .......................................................... 19

ARGUMENT ................................................................................ 21

   I.    The District Court Did Not Abuse Its Discretion In Denying Defendant's Motion For Rule 16 Sanctions. ..................................... 21

      A.    Standard of Review .................................................... 21

      B.    Analysis ................................................................. 22

         1.    The Government's Inability To Obtain Source Code In the Possession Of a Foreign Government, Despite Its Good Faith Efforts, Did Not Amount To a Rule 16 Violation. .......... 24

         2.    No Available Information Indicated a Fourth Amendment Search Of Defendant's Computer Occurred, Underscoring the FBI's Good-Faith Actions. .................................... 29

         3.    Even Assuming the Government Failed To Disclose Rule 16 Material, Sanctions Were Still Not Warranted ................... 37

   II.    The District Court Did Not Abuse Its Discretion In Denying Defendant's Motion For Sanctions Based On an Alleged *Brady* Violation. .......................................................................... 40

      A.    Standard of Review .................................................... 40

      B.    Analysis ................................................................. 40

CONCLUSION ............................................................................. 51

## TABLE OF AUTHORITIES

### CASES

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................................. 27, 37

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................... 1, 17, 20, 40

*Davis v. United States*, 564 U.S. 229 (2011) .................................................... 33

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ............................................. 43

*Guzman v. Jones*, 804 F.3d 707 (5th Cir. 2015) ............................................... 38

*Hudson v. Michigan*, 547 U.S. 586 (2006) ........................................................ 33

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008) .................................................................................................................... 35

*Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153 (7th Cir. 1998) ................ 22

*Miller v. Chicago Transit Authority*, 20 F.4th 1148 (7th Cir. 2021) ............... 42

*Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422 (7th Cir. 2010) .................................................................................................... 38

*Strickler v. Greene*, 527 U.S. 263 (1999) .................................................... 41, 50

*United States v. Ballard*, 885 F.3d 500 (7th Cir. 2018) ............................. 40, 41

*United States v. Bell*, 819 F.3d 310 (7th Cir. 2016) ........................................ 27

*United States v. Bowie*, 198 F.3d 905 (D.C. Cir. 1999) ................................... 43

*United States v. Bullock*, 130 F. App'x 706 (6th Cir. 2005) ........................... 44

*United States v. Caira*, 833 F.3d 803 (7th Cir. 2016) ................................. 9, 31

*United States v. Chaparro-Alcantara*, 226 F.3d 616 (7th Cir. 2000) .................................................................................... 22, 26, 27, 45

*United States v. Cherry*, 920 F.3d 1126 (7th Cir. 2019) ....................... 21, 27, 40

*United States v. Chiaradio*, 684 F.3d 265 (1st Cir. 2012) ............................... 49

ii

*United States v. Clarke*, 979 F.3d 82 (2d Cir. 2020) ........................................ 48

*United States v. Dahl*, 597 F. App'x 489 (10th Cir. 2015) .............................. 44

*United States v. De La Rosa*, 196 F.3d 712 (7th Cir. 1999) .......... 21, 22, 24, 39

*United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005) ................................ 29

*United States v. Edwards*, 34 F.4th 570 (7th Cir. 2022) ................................ 43

*United States v. Freeman*, 650 F.3d 673 (7th Cir. 2011) ................................ 40

*United States v. Getto*, 729 F.3d 221 (2d Cir. 2013) ...................................... 35

*United States v. Gray*, 648 F.3d 562 (7th Cir. 2011) ................................ 37, 43

*United States v. Hoeffener*, 950 F.3d 1037 (8th Cir. 2020) ............................ 48

*United States v. Jackson*, 598 F.3d 340 (7th Cir. 2010) .......................... 30, 31

*United States v. Janis*, 428 U.S. 433 (1976) ................................................... 25

*United States v. Jones*, 56 F.4th 455 (7th Cir. 2022) ................................ 22, 29

*United States v. Kienast*, 907 F.3d 522 (7th Cir. 2018) ........................ 9, 31, 34

*United States v. Kontny*, 238 F.3d 815 (7th Cir. 2001) ................................... 36

*United States v. Lee*, 723 F.3d 134 (2d Cir. 2013) ................................... *passim*

*United States v. Michaud*, 2016 WL 337263 (W.D. Wash. Jan. 26, 2016)........ 9

*United States v. Morris*, 957 F.2d 1391 (7th Cir. 1992) ...................... 41, 42, 49

*United States v. Mota*, 685 F.3d 644 (7th Cir. 2012) ..................................... 40

*United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009) ................................. 17

*United States v. Owens*, 18 F.4th 928 (7th Cir. 2021) ........................... *passim*

*United States v. Reyeros*, 537 F.3d 270 (3d Cir. 2008) ................................... 39

*United States v. Risha*, 445 F.3d 298 (3d Cir. 2006) ...................................... 39

*United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) .................................. 38

*United States v. Soybel*, 13 F.4th 584 (7th Cir. 2021)................................ 31, 49

*United States v. Stokes*, 726 F.3d 880 (7th Cir. 2013) .................. 34, 35, 36, 50

*United States v. Stott*, 245 F.3d 890 (7th Cir. 2001) ........................................ 44

*United States v. Thomas*, 835 F.3d 730 (7th Cir. 2016)................................. 43

*United States v. Thomas*, 2023 WL 1991573 (5th Cir. Feb. 14, 2023)............ 37

*United States v. Valdivia*, 680 F.3d 33 (1st Cir. 2012) ................................... 26

## STATUTES

18 U.S.C. § 2252(b)(1) ..................................................................................... 46

18 U.S.C. § 2252A(a)(5)(B) ............................................................................... 8

## RULES

Fed. R. Crim. P. 11(a)(2) .................................................................................. 19

Fed. R. Crim. P. 16........................................................................................... 18

Fed. R. Crim. P. 16(a)(1)(E)(i) ........................................................................ 22

Fed. R. Crim. P. 16(d) ..................................................................................... 22

Fed. R. Crim. P. 41.......................................................................................... 32

## JURISDICTIONAL STATEMENT

Defendant-Appellant's amended jurisdictional statement is complete and correct.

## ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion in declining to sanction the government, under Rule 16 of the Federal Rules of Criminal Procedure or *Brady v. Maryland*, 373 U.S. 83 (1963), for not producing computer source code possessed by a foreign government, when the FBI made good-faith efforts to obtain the code, foreign law prohibited its disclosure to the FBI, and defendant's primary basis for seeking the code was speculation that it might reveal a Fourth Amendment violation committed by foreign law enforcement abroad.

## STATEMENT OF THE CASE

### *Offense Conduct*

Defendant Deny Mitrovich downloaded child pornography from an online platform called The Love Zone, a site on the internet's "Dark Web" that enabled users to share child pornography files. R. 130 at 3.[1] Defendant also was an active supplier of The Love Zone's cache of illicit material. Between August 3, 2014, and December 9, 2014, defendant—operating under the

---

[1] Citations to the electronic record on appeal are to "R.," followed by the document number. Defendant's brief and appendix are cited as "Br." and "App.," respectively. Page numbers are included where appropriate.

moniker "cyberguy"—uploaded child pornography to the site on approximately 24 different occasions. *Id.* For example, on September 10, 2014, defendant added a link to a child pornography video titled "Suger [sic] Spice girl slurping cock ; )." *Id.* The four-minute video depicted a prepubescent girl being orally penetrated by an adult male's penis. *Id.* In another instance, on October 10, 2014, defendant contributed a video labeled "Little pussy – Tight fit" that showed an adult male vaginally penetrating a prepubescent girl with his penis and finger. *Id.*

When the FBI searched defendant's Chicago home with a warrant in 2015, agents found three hard drives that contained a total of nearly 1,300 child pornography images and approximately 539 child pornography videos. Defendant's collection included portrayals of sado-masochistic conduct and violence, including different images portraying a prepubescent girl (1) handcuffed while being sexually abused, (2) being urinated on, (3) kept inside a dog crate, and (4) with the words "hurt me" written on her body. App. 26; R. 130 at 4.

### *Investigation*

The FBI unmasked defendant as The Love Zone's "cyberguy" through an investigation conducted by its Child Exploitation Unit, which worked cooperatively with foreign law enforcement agencies to dismantle the site. App. 24-26. Because The Love Zone operated on the internet's "Dark Web," the

task of identifying its administrators and users proved more challenging than had it functioned on the regular internet (or "clear web"). *See id.*

To access The Love Zone, would-be child pornography viewers first needed to download The Onion Router ("Tor"), a software designed to disguise one's IP address and, therefore, his location. Whereas ordinarily an internet user automatically shares his IP address with each website he visits, the Tor network conceals that information by routing the connection through different servers on its way to accessing a website—effectively anonymizing the identity of the website's visitor. App. 24-25; R. 48 at 11.

In 2014, the FBI learned that The Love Zone was physically hosted on a server in the Netherlands and that its administrator resided in Australia. App. 25. The FBI shared that lead with Australia's Queensland Police Service. *Id.* Thereafter, Queensland Police Service—without direction from the FBI— worked closely with New Zealand's Department of Internal Affairs in identifying The Love Zone's administrator and securing his cooperation. *Id.* at 25-26; R. 96 at 5 n.2. Those two foreign entities (hereinafter referred to as the "Oceanian Authorities") then operated the website for several months to try and unmask its users. *Id.*

Impersonating the site's administrator, the Oceanian Authorities posted a link to a child pornography video that—unlike other videos on The Love Zone—presented users with the option to open their computer's Windows

3

Media Player and stream it through that program. App. 25-26; R. 92, Ex. B. The post assured the user that while the video would stream from an external website (http://streaming.thelove.zone), opening the video would not jeopardize the user's anonymity. *Id.*; *see also* R. 96 at 5-6. But that was a ruse.

In reality, when the video opened in Windows Media Player, it worked like a video streamed from any ordinary website—that is, by relaying the user's true IP address to the website that hosts the video. App. 26; R. 96 at 5-8. Accordingly, any user of The Love Zone who elected to open the video inadvertently shared his IP address with the Oceanian Authorities. *Id.* Below are screen shots displaying (1) the ruse post that advertised the video, (2) the pop-up message triggered by clicking the hyperlink within the post, and (3) the video streaming in Windows Media player after a user clicked "OK" to approve that action (its pornographic content is redacted).

*Ruse post advertising the video*



The post reads:

> i along with some of the admins have been working on an idea to help improve the site as there have been issues with the .onion hosting around speed and reliability specifically around video streaming..the idea has caused debate amongst the admins but has received positive feedback from VIP members.
>
> i have had discussions with [Admin] and it has been agreed that the site will offer video streaming if members want it...basically the video is hosted on a clearnet server which is hidden behind a cloudflare server...the IP Address is hidden behind a CDN which if anyone tries to track will resolve to non-existent servers which are removed from the actual location...this protects the server and you ;) there have been security concerns about the video streaming...to help you decide read this...blog.cloudflare.com/58611873 - lulzsec wouldn't use cloudflare if they were worried they could be tracked!

below is a video which [Admin] has made from his own private collection...when you click the link you will be prompted to open an .asx file which is an advanced stream redirecter which is a file that allows video streaming and can be used with most media players...it has been tested on windows mac and linux...watch it

### *Pop-up message seeking consent to open Windows Media Player and stream video from http://streaming.thelove.zone*



The pop-up message reads:

You have chosen to open:
sg1.asx
which is: Windows Media Audio/Video playlist (217 bytes)
from http://streaming.thelove.zone

The message then asks: "What should TorBrowser do with this file?" and displays that clicking "OK" will cause the file to "Open with Windows Media Player" by default.

***Windows Media Player open and streaming after user clicked "OK"***



R. 92, Ex. B.

"Cyberguy" was one of The Love Zone users who viewed the post and clicked "OK," choosing to watch the video with Windows Media Player and thereby conveying his IP address to The Love Zone's server. App. 26; R. 96 at 8. Because his IP address was one located within the United States, the Oceanian Authorities shared it with the FBI. App. 26. Through his internet service provider, the FBI identified defendant's home address and obtained a

search warrant for the residence. Inside defendant's home, agents found the aforementioned hard drives containing a trove of child pornography images and videos. *Id.*

### Indictment

On November 20, 2018, defendant was charged in a one-count indictment with possessing child pornography involving a prepubescent minor and a minor who had not attained the age of 12, in violation of 18 U.S.C. § 2252A(a)(5)(B). R. 1.

### Motion to Compel Discovery

On December 3, 2019, defendant filed a motion to compel discovery that sought two broad categories of information:

(1) any and all communications between the government and the Oceanian Authorities, and

(2) information regarding the software used to obtain defendant's IP address.

R. 48 at 1. The motion contended that defendant needed such information for two reasons. First, defendant sought "to establish that the FBI and [the Oceanian Authorities] were working in concert with one another at the time [his] IP address was seized." *Id.* at 9. Second, defendant desired "to shed light on the capabilities of the software utilized in seizing the IP address" to determine whether the Oceanian Authorities might have unconstitutionally searched his computer when he clicked "OK" to stream the video they posted.

*Id.* at 9, 15-16. To support that possibility, defendant cited to cases where the FBI had obtained a search warrant before deploying a technology known as a "Network Investigative Technique" ("NIT") to learn information about an individual's computer, including its IP address. *Id.* at 16.

The government opposed the motion, arguing that—even assuming that the FBI was responsible for the conduct of foreign law enforcement—no Fourth Amendment violation could have occurred because the Oceanian Authorities learned defendant's IP address when he affirmatively chose to open a video file from an external website, not from any search conducted by those agencies. R. 53 at 2-6. The government highlighted that, in contrast, the technique known as a "NIT" involves a circumstance where a target computer is literally "taken over and compelled to transmit identifying information to government computers"—hence why the FBI seeks a search warrant before using it. *Id.* at 5 (citing *United States v. Michaud*, 2016 WL 337263, at *2 (W.D. Wash. Jan. 26, 2016)). *See also United States v. Kienast*, 907 F.3d 522, 526 (7th Cir. 2018). In further defense of the foreign agencies' actions, the government emphasized that this Court already has held that an internet user has no reasonable expectation of privacy in his IP address—the only information gleaned by the Oceanian Authorities. *Id.* at 3, 7-8 (citing *United States v. Caira*, 833 F.3d 803, 809 (7th Cir. 2016)).

In his reply brief, defendant hypothesized that because he had accessed The Love Zone through the Tor browser, "the hyperlink [he clicked] must have contained malware that forced [his] computer to send the identifying information to [the Oceanian Authorities] or forced it to exit from the Tor Browser and onto the open internet." R. 56 at 1. Defendant again pointed to cases involving NITs to support the plausibility of his theory, *id.* at 7-14, and submitted that they provided him "a good-faith basis to believe that the hyperlink contained . . . malware" that infringed his "Fourth Amendment rights," *id.* at 20-21.

The government's sur-reply attached a report from the FBI's Child Exploitation Unit, the group that interfaced with the Oceanian Authorities during The Love Zone investigation. R. 62, 62-1. According to Supervisory Special Agent Brooke Donahue, the Oceanian Authorities did not utilize malware or otherwise infiltrate users' computers to obtain their IP addresses. R. 62-1 at 2. Rather, as users were specifically advised it would, the link simply opened Windows Media Player—a program already present on a user's computer and one that operates separate from the Tor browser. *Id.* Doing so, Special Agent Donahue explained, allowed the foreign agents to see the user's IP address on the "clear web" in the same way that all normal internet activity reveals a user's IP address (*i.e.,* without the shroud of Tor blocking the signal).

*Id.* As the FBI understood the Oceanian Authorities' actions, "no information [was] collected from inside the user's computer" to learn his IP address. *Id.*

The government further contended that, regardless of the technique employed by the foreign agencies, defendant could not make out a colorable Fourth Amendment claim because the FBI had not participated in a joint venture with those agencies. R. 62 at 6-7. As Special Agent Donahue's report explained, the FBI regularly shares child exploitation-related information with foreign agencies because such investigations so frequently cross international borders. *Id.* at 8. In this case, Special Agent Donahue represented that "the FBI did not provide any information to, or make requests of [the Oceanian Authorities]," *id.* at 7, had no access to the foreign agencies' files, *id.* at 9, and was not privy to the "minute details" of how those agencies learned IP addresses of The Love Zone's users, *id.* at 4. Although the Oceanian Authorities shared investigative leads with the FBI (such as defendant's IP address), the FBI considered that relationship to be at "arm's length." *Id.* at 9. As a result, the government argued that the information defendant sought to compel could not possibly support a viable motion to suppress on Fourth Amendment grounds. *Id.*

In response to the government's sur-reply, defendant contended that the FBI's "ongoing cooperative relationship" amounted to a joint investigation that should render the FBI responsible for any investigative actions taken by its

11

counterparts abroad. R. 65 at 7. Defendant requested that the government be compelled to learn and disclose "[t]he way in which the malware, or hyperlink, actually operated" to allow him to "prepare a meaningful Fourth Amendment suppression argument." *Id.* 16-17.

On April 3, 2020, the district court granted defendant's discovery motion, with the caveat that the government could object to producing specific types of information that otherwise fell within defendant's broad requests. App. 32. In reaching its ruling, the court found it "plausible" that the FBI and the Oceanian Authorities had participated in a joint operation. App. 29. Given defendant's citations to other instances where the FBI had remotely searched a computer, the court likewise ruled that defendant had sufficiently shown that malware could have been employed to obtain his IP address. App. 30-32. The district court granted the motion to compel the information sought by defendant, "subject to any targeted objections [by the government] to the production of specific material." *Id.* at 32.

### Government's Subsequent Production

The government thereafter produced approximately 1,000 additional pages of discovery, including all written communications between the FBI and foreign law enforcement concerning The Love Zone. R. 92 at 3; *see also* R. 83, 89. Among the documents was a five-page explanatory "Technique Overview" that the FBI received from the Oceanian Authorities. R. 92, Ex. A. Consistent

with Special Agent Donahue's understanding, it revealed that the Oceanian Authorities configured the child pornography video they advertised to open and stream from a program distinct from the Tor browser itself (*i.e.,* Windows Media Player). By posing as the administrator of The Love Zone, the Oceanian Authorities hoped would-be streamers of the video would be duped by the ad's false assurance that their use of Windows Media Player would be anonymous. *Id.* at 2-5. The "Technique Overview" made no mention of malware or any other invasive protocol. *See id.*

The government also produced visual screen shots (as shown above) that illustrated, sequence by sequence: (1) the ruse posting the Oceanian Authorities placed on The Love Zone, (2) the pop-up message that appeared when a user (like defendant) clicked the post's hyperlink to view the child pornography video it described, and (3) the Windows Media Player program opening in a separate window, outside the Tor browser, after a user clicked "OK" to authorize that action (collectively, the "Screenshots"). R. 92, Ex. B; *see also supra* at 5-7.

By November 2, 2020, following "constant discussions" between the parties and multiple additional discovery productions, the government had turned over every document in its possession that was responsive to the defendant's requests and, in its view, had fully complied with the district court's discovery order. *See* R. 89.

13

*Motion for Sanctions*

Dissatisfied, on January 9, 2021, defendant filed a motion for sanctions. R. 92. In it, he complained that the government had failed "to produce either the software or the source code used to direct users from a Tor browser to the open internet." *Id.* at 1. Defendant acknowledged that the FBI did not possess the source code he sought—and that, indeed, the Oceanian Authorities had refused the FBI's past and present requests for it—but contended that the government's inability to obtain it nevertheless violated the court's directive. *Id.* at 5-6.

Defendant attached a declaration from forensic examiner Jeffrey Fischbach, whom defendant retained to review the Technique Overview and Screenshots produced in discovery. R. 92, Ex. D. According to Fischbach, while those documents did provide some of the code utilized by the Oceanian Authorities, they lacked the granularity needed to conclusively determine whether malware had been used. *Id.* ¶ 9. In Fischbach's words, until he could see the full source code, it remained "conceivable that this block of code is used dynamically in order to surreptitiously download a piece of rogue 'malware' to a user's computer, in order to circumvent the Tor protocol." *Id.*

Because the FBI could not obtain the full source code underlying the Oceanian Authorities' program, defendant asked the district court to sanction the government either by (1) dismissing the indictment, or (2) suppressing all

evidence obtained through the FBI's use of defendant's IP address—including the child pornography ultimately found on the hard drives in his home. R. 92 at 2.

In its response, the government argued that sanctions were inappropriate because the FBI did not possess the code defendant sought; the government had not conducted a joint investigation with the Oceanian Authorities; and, regardless, it had made a good-faith effort to obtain the specific information defendant requested. R. 96 at 2. Both parties agreed that an evidentiary hearing would be necessary to resolve the question of whether a joint investigation had occurred, but that the COVID-19 pandemic posed logistical hurdles to conducting a hearing at that time (February 2021). *Id.* at 2-3; *see also* 97 at 14 (defendant agreed that "the court need not conduct an evidentiary hearing . . . at this point"). Accordingly, the parties requested that the district court first decide whether the government's good-faith attempt to obtain the source code by itself precluded discovery sanctions, and only hold a hearing to decide the joint-investigation question if necessary to resolve defendant's motion. R. 96 at 3 n.1.

To demonstrate the FBI's good faith, the government chronicled its efforts to fulfill defendant's discovery requests. R. 96 at 8-13. Email exchanges between FBI agents and their foreign counterparts showed that the FBI first requested more specific technical information seven years earlier (in 2014)

when the FBI was provided American IP addresses that purportedly had accessed The Love Zone. *See id.* at 10-13. At that early juncture, the FBI sought to verify the accuracy of the information for the purpose of preparing affidavits for search warrants like the one it obtained for defendant's home. *Id.* (an FBI agent asking: "would you mind providing a more specific explanation of how it functions? We and DOJ just need to have a better understanding before we can start drafting any search warrants."). But even for that purpose, the Oceanian Authorities would not share technical details of their software. *Id.*

Later, in 2016, an FBI agent traveled to New Zealand and renewed the request for details beyond what the Technique Overview contained. To no avail. R. 96 at 13 n.5. In 2020, when FBI again requested the specific software or source code used, the Oceanian Authorities disclosed that it was "a non-invasive technique only capable of returning [a user's IP address]" after the user "engage[s] in a criminal act [clicking "OK" to watch child pornography] prior to broadcasting their IP and source port information." *Id.* at 13 n.6. Ultimately, the Oceanian Authorities explained to the FBI that New Zealand law prohibited disclosure of any additional information concerning the investigative techniques employed by its law enforcement agency. *Id.*

Given the FBI's genuine-but-futile efforts to obtain anything more, the government argued that it had complied with the court's order to produce items responsive to defendant's requests subject to "targeted objections to the

production of specific material." R. 96 at 14-15 (citing R. 73 at 9). In support of its position, the government cited, among other cases, *United States v. Lee*, 723 F.3d 134 (2d Cir. 2013), where the Second Circuit deemed Rule 16 inapplicable to Jamaican wiretap applications, regardless of whether a joint investigation took place, because Jamaican law enforcement had refused the United States' requests for the materials. R. 96 at 16-17.

In his reply brief, defendant disputed the applicability of the good-faith doctrine in this context. *See* R. 97 at 2-3. In defendant's view, if a joint investigation did occur, the FBI's good faith should not absolve the government's non-production of the software and source code he desired, since (as he saw it) that information could generate a viable motion to suppress evidence. *Id.* at 6-13. Defendant posited that the missing source code might also support "a chain of evidence defense" at trial, or an argument that the Oceanian Authorities' technique "left his computer vulnerable to outside attack," hypothetically allowing someone else to plant contraband on his computer. *Id.* at 17. Defendant claimed these possibilities infringed his Due Process and *Brady* rights.[2] *Id.* at 17.

---

[2] Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government must "disclose evidence that is favorable to a defendant and material to either his guilt or punishment." *United States v. Olofson*, 563 F.3d 652, 661 (7th Cir. 2009).

On July 7, 2021, the district court denied defendant's motion for sanctions. App. 13. To begin, the court noted that defendant had misunderstood its previous order: while it required the government to respond to defendant's discovery requests, "[t]hat was as far as [it] went." App. 17-18. "The court did not, as Mitrovich suggest[ed], order the Government to turn over any specific materials." App. 18. And, the district court clarified, "the Government has no obligation to turn over materials that it does not have and cannot obtain through good faith, diligent efforts." *Id.* (citing advisory committee notes to Fed. R. Crim. P. 16 and multiple courts of appeals). Therefore, the court ruled that because New Zealand law barred disclosure of the materials that for years the FBI (and now defendant) sought to discover, the government had fulfilled its Rule 16 obligations to produce all relevant materials in its possession.  App. 16, 19.

Regarding defendant's invocation of his Due Process and *Brady* rights, the district court stressed that the government had done nothing to infringe them. App. 20. The court found that, even if the government was in constructive possession of the source code defendant sought, he had fallen short of demonstrating that it was material or exculpatory. App. 22. The court characterized defendant's *Brady* theory as nothing "more than speculation . . . that it is *possible* that when a person's computer is infected with malware, other people may be able to store contraband on the computer's drives without

the owner's knowledge." App. 22. And, in light of "the fancifulness of his proposed defense theory," the district court found it "hard to see how the evidence Mitrovich seeks could have any effect on a jury." App. 23.

### *Conditional Guilty Plea and Sentencing*

On March 2, 2022, defendant entered a conditional guilty plea to the indictment's single count. R. 129. Under the plea agreement's terms, and pursuant to Federal Rule of Criminal Procedure 11(a)(2), defendant preserved his right to appeal the district court's order declining to impose discovery sanctions. R. 130 at 13.

On December 19, 2022, the district court sentenced defendant to 84 months' imprisonment followed by five years of supervised release. App. 2-3.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in denying defendant's motion for discovery-related sanctions. Federal Rule of Criminal Procedure 16 requires the government, upon request of a defendant, to produce materials in its possession, custody, or control that are material to preparing the defense. Yet it was undisputed that the material defendant sought to review—computer source code that foreign law enforcement used to detect his IP address—was in the possession of a foreign sovereign and never actually possessed by the FBI. Further, it is well settled in this Circuit and the U.S. Supreme Court that where potentially exculpatory evidence is unavailable—because it has been

lost, destroyed, or for other reasons—a defendant must show bad faith on the part of the government before sanctions are proper. Here, there was no dispute that FBI agents made diligent and good-faith efforts to obtain the code, but that their foreign counterparts had refused all such requests and, in fact, told the FBI that foreign law prohibited the information's disclosure. Accordingly, the district court was correct not to sanction the government for failing to obtain and produce the source code defendant wished to review.

The district court also was right to reject defendant's claim for sanctions on the basis of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant's right under *Brady* entitles him to discovery that is material to his guilt or innocence, and this Court has never extended that right to the suppression context. Consistent with prevailing case law, the district court rightly viewed defendant's *Brady* argument through the prism of a trial and reasonably concluded that his purported defense theory—that foreign law enforcement rendered his computer vulnerable to hackers, who could have framed him with possessing child pornography—was too "fanciful" to establish that the source code he sought was material or exculpatory.

While defendant contends that the district court should have analyzed his *Brady* claim through the lens of his suppression theory—that foreign agents violated the Fourth Amendment if they searched his computer remotely—he never expressly made that argument below and so it is forfeited.

20

On the merits, this Court has held that arguments rooted in speculation do not suffice in establishing the materiality of missing evidence. And, here, the voluminous discovery produced all pointed to the conclusion that nothing unconstitutional occurred when defendant revealed his IP address to a foreign government operating abroad. Defendant's suppression argument, therefore, was too far-fetched—both factually and legally—to establish that the missing source code was material or that its absence altered the outcome of the proceedings. No *Brady* violation occurred, and the district court did not abuse its discretion in denying his motion for sanctions.

## ARGUMENT

### I.    The District Court Did Not Abuse Its Discretion In Denying Defendant's Motion For Rule 16 Sanctions.

#### A.    Standard of Review

This Court reviews a district court's ruling on a defendant's motion to compel discovery for an abuse of discretion, *United States v. Owens*, 18 F.4th 928, 936 (7th Cir. 2021), and "will reverse only where there is an appreciable risk that prejudice resulted," *id.* at 941 (citation omitted). This Court likewise reviews a district court's ruling on a motion for discovery-related sanctions for an abuse of discretion. *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019); *United States v. De La Rosa*, 196 F.3d 712, 715 (7th Cir. 1999). A district court's determination regarding whether the government acted in good faith is

a factual finding that is reviewed deferentially, with all reasonable inferences drawn in favor of the factfinder. *United States v. Chaparro-Alcantara*, 226 F.3d 616, 623 (7th Cir. 2000) (citing *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) ("'Bad faith' is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference.")). This Court will upset a district court's factual findings only when it is left with "a definite and firm conviction that a mistake has been made." *See United States v. Jones*, 56 F.4th 455, 498 (7th Cir. 2022).

**B.      Analysis**

Federal Rule of Criminal Procedure 16 mandates that, upon a defendant's request, the government "must permit the defendant to inspect and to copy or photograph" evidence that is (1) "within the government's possession, custody, or control" and (2) "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). If the government fails to comply, Rule 16 empowers the district court to "order [the government] to permit the discovery or inspection," "grant a continuance," "prohibit [the government] from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d). The district court has wide discretion in determining, in the first instance, whether the government has violated Rule 16 and, if so, in fashioning an appropriate sanction. *See Owens*, 18 F.4th at 936; *De La Rosa*, 196 F.3d at 715.

Here, the district court properly exercised its authority in both these realms. First, because the court deemed it "plausible" that the FBI and Oceanian Authorities engaged in a joint investigation, and mindful of defendant's citations to cases where the FBI had obtained a warrant to remotely search a target's computer with malware, the district court reasonably ordered the government to fulfill defendant's request for more information on those two topics, to the extent it was able. *See* App. 29, 32. When the government did so—turning over all responsive materials it had or could obtain—the district court appropriately deemed fulfilled the government's discovery obligations under Rule 16. App. 19-20. And with nothing else to produce, and no contempt to sanction, the district court logically denied defendant's request to punish the government for allegedly violating the court's order—whether by dismissing the indictment, suppressing the child pornography found in defendant's home, or otherwise. *See* App. 18.

Indeed, defendant had conceded that the FBI was unable to obtain the source code at issue. R. 92 at 5. And, without objection from defendant, the district court had found (1) that the FBI made "good faith, diligent efforts" to obtain the source code but (2) that New Zealand law "barred" the Oceanian Authorities from providing that information. App. 16, 18. In light of those uncontested findings, the district court did not abuse its discretion in deeming the government's Rule 16 obligations satisfied or in declining to impose any

discovery-related sanction. *See De LaRosa*, 196 F.3d at 715 ("The trial court generally has discretion to fashion an appropriate sanction" in the Rule 16 context.).

### 1. The Government's Inability To Obtain Source Code In the Possession Of a Foreign Government, Despite Its Good Faith Efforts, Did Not Amount To a Rule 16 Violation.

The government never actually possessed the source code defendant wished to review and, despite its good-faith efforts, could not obtain it from the Oceanian Authorities. The district court therefore did not abuse its discretion in concluding that "the Government has no obligation to turn over materials that it does not have and cannot obtain through good faith, diligent efforts." App. 18 (relying on Rule 16's advisory committee notes).

Defendant argues that the government's inability to obtain information that potentially could help his defense should not be excused on the basis of good faith, particularly if it engaged in a joint investigation with an entity that possesses the information. Br. 16-22. Without meaningful analysis, defendant criticizes the district court's reliance on the Second Circuit's *Lee* decision, misdescribing it as a case involving the Jencks Act and contending that it conflicts with this Circuit's precedent. Br. 22-24. Defendant is wrong on both fronts. *Lee* concerned facts analogous to this case and concluded that Rule 16 simply did not apply to items not actually within the government's possession, custody, or control. Moreover, *Lee* is in accord with this Circuit's cases which

24

make clear that Rule 16 sanctions are only appropriate when agents acted in bad faith.

In *Lee*, the Second Circuit affirmed the Eastern District of New York's denial of a motion to compel information underlying a Jamaican wiretap or, alternatively, to suppress the intercepted calls from the wire that Drug Enforcement Administration (DEA) agents used to further their own investigation and later presented to a grand jury. 723 F.3d at 137. In discovery, Lee sought the materials underlying the Jamaican wiretap applications to determine the legality of the actions taken by foreign law enforcement (who, notably, operated under a formalized cooperation agreement with DEA) and also to determine whether an agency relationship existed between DEA agents and their Jamaican counterparts. *Id.* at 138. However, "despite diligent efforts," the government was unable to obtain from Jamaica the information Lee wanted. *Id.* When the government failed to produce it, Lee moved for sanctions. *Id.*

The Second Circuit agreed with the district court that sanctions were improper. 723 F.3d at 142. For starters, the Supreme Court declared in *United States v. Janis*, 428 U.S. 433, 455 n.31 (1976), that "the exclusionary rule, as a deterrent sanction, is not applicable where . . . a foreign government commits the offending act." *Id.* at 139. The Second Circuit separately stressed that, where a foreign sovereign is involved, "the Fourth Amendment's exclusionary

rule does not serve the deterrence purpose for which it was designed because 'the actions of an American court are unlikely to influence the conduct of foreign police.'" *Id.* (quoting *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012)). With those principles in mind, and given Rule 16's application only to materials "within the government's possession, custody, or control," the Second Circuit held that even if DEA and the Jamaican authorities engaged in a joint investigation, DEA's "good-faith effort to obtain the documents" defendant sought put them outside of Rule 16's edict. *Id.* at 141. Having turned over all that it possessed and reasonably could obtain, the Second Circuit agreed there was no basis for sanctions. *Id.* at 142.

The facts of *Lee* are on all fours with the instant case, and its holding unequivocally supports the district court's judgment, in light of the FBI's inability to access the information defendant wanted to review. Contrary to defendant's assertion that the district court "plucked" "a new rule" from *Lee*, Br. 22, the Second Circuit's views are entirely consistent with those of this Circuit—and the United States Supreme Court—both of which long have held that discovery sanctions are improper when the government has acted in good faith.

In *Chaparro-Alcantara*, 226 F.3d at 622-23, for example, this Court affirmed the district court's denial of a motion to dismiss an indictment premised on defendant's claim that the government had violated his Due

Process rights by deporting witnesses that were essential to the preparation of his defense. In doing so, this Court agreed that the issue turned on whether the government acted in bad faith, stressing: "The Supreme Court has explained that there is a difference between those situations in which the police fail to disclose to the defendant evidence that it knows to be material and exculpatory, and those situations in which police simply fail to preserve potentially exculpatory evidence." *Id.* at 623 (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)). "With respect to lost or destroyed evidence, the [Supreme] Court held that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Id.* (quoting *Youngblood*, 488 U.S. at 58).

This Court has reiterated that well-established principle time and again. *See, e.g.*, *Cherry*, 920 F.3d at 1140 ("When a defendant alleges that the government failed to preserve potentially exculpatory evidence . . . our precedent demands that [defendant] demonstrate . . . bad faith by the government . . . . Bad faith, in turn, requires proof of an 'official animus' or 'conscious effort to suppress exculpatory evidence, and necessarily turns on an official's subjective knowledge that the evidence had exculpatory value at the time it was lost or destroyed.") (citation omitted); *United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) ("Only if bad faith is shown does the court

27

consider the constitutional materiality of the evidence in question, to evaluate whether the defendant ultimately was deprived of due process.").

Though he never questioned the FBI's sincerity below, on appeal defendant accuses its agents of "display[ing] flagrant misconduct" in failing to obtain the source code at some earlier stage in the investigation. Br. 39-40. Defendant forfeited—if not waived—this claim, and any implications he suggests it should have, by not raising it in the district court. App. 19 ("Mitrovich does not dispute that the Government has made efforts to learn additional details about the technique used by the Oceanian authorities to uncover his IP address, or that the Government has turned over everything it knows about the technique.")

In any event, the district court's finding concerning the FBI's good faith is amply supported by the record which, as set forth above, detailed its years-long efforts to learn how the source code functioned. Those attempts began in 2014, when agents were preparing search warrants for the homes of U.S. residents whose IP addresses they were given, and continued even after defendant filed his motion to compel. *See* R. 96 at 8-13. Moreover, the district court separately concluded that New Zealand law prohibited the source code's disclosure, App. 16, and defendant does not challenge that conclusion on

appeal.[3] In light of the uncontested evidence before it, *see* R. 96 at 8-13, the district court did not err—let alone clearly err—in finding that foreign agents refused the FBI's good-faith attempts to obtain the information at issue. *See Jones*, 56 F.4th at 498 (findings of fact are reversed only when this Court has a "definite and firm conviction that a mistake has been made").

### 2.     No Available Information Indicated a Fourth Amendment Search Of Defendant's Computer Occurred, Underscoring the FBI's Good-Faith Actions.

Nothing in the information provided by the Oceanian Authorities about their technique indicated a violation of defendant's Fourth Amendment rights. To the contrary, the evidence showed that the Oceanian Authorities—foreign governments, acting on foreign soil—used a ruse to get defendant to voluntarily click a link that then revealed his IP address, information in which defendant had no reasonable expectation of privacy. And while the district court may have assumed the source code was material in deciding defendant's

---

[3] It is not unusual for governments to resist or limit discovery of classified or sensitive information. For instance, the Classified Information Procedures Act permits the U.S. government to protect and restrict the discovery of classified information, and a district court's decision in that context likewise is reviewed for an abuse of discretion. *See United States v. Dumeisi*, 424 F.3d 566, 577-78 (7th Cir. 2005). Courts also have recognized the existence of a law enforcement investigative privilege when information sought by a defendant is not material and could jeopardize an ongoing investigation. *See, e.g.*, *Owens*, 18 F.4th at 935 (noting the district court's conclusion that "the law enforcement investigative privilege" protected source code, though not reaching that issue on appeal). In other instances, as in *Lee*, a foreign government may be unwilling or unable to share with another sovereign certain details about its own investigative techniques. 723 F.3d at 138.

motion to compel, the tenuousness of its materiality to the defense—and the lack of any indication that his Fourth Amendment rights were violated—informs the good-faith analysis, because it underscores that the FBI acted reasonably over the course of the investigation.

As defendant acknowledged in the district court, the value of the evidence he sought is unknown. App. 19; R. 92 at 11 (contending that without the source code, "it is impossible to prove exactly how this code was utilized, and for what purpose"). Indeed, the very premise of defendant's motion to compel was that the information *might* establish a viable Fourth Amendment claim or support an argument at trial that the program somehow rendered his computer vulnerable to hackers. *See, e.g.*, R. 48 at 16 (seeking to compel discovery to "fully understand" the Oceanian Authorities' software); R. 92 at 5 (seeking sanctions because the Technique Overview produced in discovery "was insufficient to determine how the hyperlink functioned"). As such, *Chaparro-Alcantara*, like *Lee*, instructs that Rule 16 sanctions are improper here, where the exculpatory nature of the missing evidence was uncertain, at best, and where the FBI did not act in bad faith.

Even if the FBI had suspected that a "search" occurred when Windows Media Player opened on defendant's computer, the information known to the agents still would suggest that defendant consented to that purported intrusion by clicking "OK" to approve and initiate the action. *See United States*

*v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) ("A well-recognized exception to the warrant requirement applies, however, when someone consents to a search."). And defendant's conjectural Fourth Amendment theory is further undermined by the fact that he had no reasonable expectation of privacy in his IP address—the only information the Oceanian Authorities obtained through their technique and shared with the FBI. As this Court recently explained:

> An IP address operates much like a phone number, and like telephone companies, internet service providers require that identifying information be disclosed in order to make communications among electronic devices possible. Though a person does not 'dial' another IP address in the ordinary sense, information was routed through a third party to complete the connection between the computer in Soybel's unit and the destination IP addresses. … Soybel assumed the risk that by connecting to Grainger servers, the fact of the connection would be revealed to law enforcement. Soybel therefore has no reasonable expectation of privacy in this data.

*See United States v. Soybel*, 13 F.4th 584, 594 (7th Cir. 2021) (citations omitted); *see also Caira*, 833 F.3d at 806-07 (collecting cases). On these facts, the FBI would have had no reason to conclude that the Oceanian Authorities violated defendant's rights in identifying his IP address.

Defendant's focus on cases involving "NITs"—a different technology not at issue here—is misplaced, and if anything, validates the district court's decision. *See, e.g.*, Br. 18, 33. As this Court outlined in *Kienast*, 907 F.3d at 526, in 2015 the FBI gained access to a Dark Web child pornography forum called "Playpen" and began operating the site on its servers in Virginia, where

it deployed a NIT.[4] Specifically, the FBI embedded Playpen's log-in page with a NIT that would download onto a user's computer when he entered his username and password to access the site. *Id.* Once the NIT downloaded, it gathered and transmitted back to FBI a panoply of data from the user's computer, including intel about its operating system, the user's name, and the IP address. *Id.* After identifying Playpen users in this way, the FBI obtained search warrants for their homes in the districts where they lived and found child pornography. *Id.* at 527.

Although the FBI obtained a warrant to deploy the NIT from a federal magistrate judge in the Eastern District of Virginia (where it operated the Playpen site) before it did so, defendants in the Northern District of Illinois moved to suppress the evidence against them on the grounds that the NIT warrant was invalidly issued in the wrong district. 907 F.3d at 526-27. Defendants contended that if the NIT searched their computers in the Northern District of Illinois, Federal Rule of Criminal Procedure 41—which mandates that warrants be issued in the district where the search is to occur— rendered it void. *Id.*

This Court declined to reach the question whether the NIT was a search that violated the Fourth Amendment because, even if so, the agents' good faith

---

[4] The Playpen investigation was unrelated to the FBI's or the Oceanian Authorities' investigations into The Love Zone.

precluded suppressing evidence. 907 F.3d at 527. The Court emphasized that "[s]uppression of evidence is a 'last resort.'" *Id.* at 527 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "It is not a personal constitutional right, nor is it intended to remedy the injury of having one's rights violated." *Id.* Rather, "it is a judge-made rule meant to deter Fourth Amendment violations," appropriate only when 'its deterrent effect on police conduct will outweigh its 'heavy costs.'" *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). The Court explained that suppression may be warranted when there is "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," but that "[e]xclusion is *not* appropriate where the police act with an objectively reasonable good-faith belief that their conduct is lawful." *Id.* (emphasis added). Accordingly, the Court held that even if the NIT warrant was void *ab initio*, the circumstance should be "treat[ed] . . . like any other constitutional violation" and look to whether the agents acted in good faith. *Id.* at 527-28. And because the agents operated under a good-faith belief that their actions were lawful, the Court concluded that this was not one of the "limited . . . cases in which [the exclusionary rule's] deterrent effect on police conduct will outweigh its heavy costs." *Id.* at 527 (citation omitted).

The same is equally true, if not more so, in the instant case, where the agents likewise acted in good faith and where they had no compelling reason to conclude that the Oceanian Authorities offended the Fourth Amendment in

obtaining defendant's IP address. To be clear, there is no evidence that the Oceanian Authorities employed a "NIT." And, to the contrary, the available information indicated to the FBI that, unlike in the NIT cases, defendant's own actions—not any "search" of his computer's hard-drive—revealed his IP address. R. 62-1 (Supervisory Special Agent Donahue's understanding). Because defendant affirmatively clicked "OK" to open Windows Media Player and stream the illicit video that conveyed his IP address to the Oceanian Authorities' server, it cannot fairly be said that the FBI was "reckless" or "grossly negligent" in concluding that malware was not used—as this Court would require before suppressing evidence following a warrantless search. *See Kienast*, 907 F.3d at 527.

More fundamentally, the FBI also would not expect that foreign agents should—or even could—first obtain a warrant from a United States court before advertising a video (accessible anywhere in the world) on The Love Zone. Even if the Oceanian Authorities expected its video would be accessed by Americans, it is well settled that searches of United States citizens conducted abroad are generally subject only to the Fourth Amendment's reasonableness requirement. As this Court has observed, "nothing in the history of the foreign relations of the United States would require that U.S. officials obtain warrants from foreign magistrates . . . or indeed, to suppose that all other states have search and investigation rules akin to our own." *United States v. Stokes*, 726

F.3d 880, 892-93 (7th Cir. 2013) (quoting *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 170 (2d Cir. 2008)). Moreover, "if U.S. judicial officers were to issue search warrants intended to have extraterritorial effect, such warrants would have dubious legal significance, if any, in a foreign nation. And it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches." *Id.* (citation omitted). For those reasons, this Court has adopted the Second Circuit's view "that the Fourth Amendment's warrant requirement, and by extension the strictures of the Warrant Clause, do not apply to extraterritorial searches by U.S. agents." *Id.* Similarly, the Second Circuit has held that the Fourth Amendment only applies to foreign law enforcement when they are acting as "agents, or virtual agents, of United States law enforcement officials" or "where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013). Nothing like that occurred here. And defendant has pointed to no authority that would require foreign agents conducting an alleged "search" of unknown individuals, in unknown locations, to first seek permission from a United States court before doing so. There is no such authority, as this Court's *Stokes* decision makes clear. 726 F.3d at 892-93.

35

While the Oceanian Authorities no doubt tricked defendant by falsely stating in their post that watching the video would not jeopardize his IP address's anonymity, this Court has been explicit that "[t]rickery, deceit, even impersonation" do not raise constitutional concerns in noncustodial settings. *See United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001). "*Nothing* is more common in the noncustodial setting of police investigations than for an undercover police officer to extract a damaging admission from a criminal suspect simply by pretending to be another criminal," *id.* (emphasis in original), which is effectively what occurred here when the foreign agents—impersonating The Love Zone's administrator—fooled defendant into opening his computer's Windows Media Player and streaming a child pornography video from an "external site" (*i.e.,* outside of Tor). *See* R. 92, Ex. B. In other words, even if the Oceanian Authorities were governed by the strictures of the United States Constitution while conducting their investigation abroad, all the information known to the FBI indicated that they acted reasonably—and therefore constitutionally—in doing so. *Stokes*, 726 F.3d at 885 (U.S. citizens searched by federal agents abroad are protected by the Fourth Amendment's "touchstone requirement of reasonableness").

### 3.    Even Assuming the Government Failed To Disclose Rule 16 Material, Sanctions Were Still Not Warranted.

Defendant entirely ignores this Court's good-faith jurisprudence in suggesting that because the district court assumed the existence of a joint investigation in deciding his motion, it automatically was required to sanction the government for not producing everything in the Oceanian Authorities' possession.[5] *See* Br. 19-21. As the Supreme Court has made clear, even when the government has possession of Rule 16 discovery, sanctions still only are appropriate when the government's inability to produce potentially useful evidence resulted from bad faith. *See Youngblood*, 488 U.S. at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

That is true even where the government had actual possession of the material, but then lost or destroyed it. *See, e.g.*, *United States v. Thomas*, 2023 WL 1991573, at *1 (5th Cir. Feb. 14, 2023) ("We permit an adverse inference

---

[5] The lone Seventh Circuit case cited by defendant ostensibly on this point, *United States v. Gray*, 648 F.3d 562, 565 (7th Cir. 2011), *see* Br. 19, is inapposite, as that case does not involve Rule 16 or documents that were in possession of another investigating agency. In *Gray*, the government produced analysis of Medicaid billing data that it created mid-trial. *Id.* at 566-67. This Court rejected defendant's argument that the government violated *Brady* by failing to produce the data in advance of trial, emphasizing that "[t]he *Brady* rule is not a rule of pretrial discovery," *id.* at 567, the government had not acted in "bad faith," and the timing of the production did not deprive defendant from using it at the trial itself, *id.* at 568.

against the spoliator or sanctions against the spoliator only upon a showing of bad faith or bad conduct.") (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)); *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) ("In order for destruction of evidence to rise to the level of a constitutional violation, a party must . . . [show] that the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed"). *Cf. Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422, 428 (7th Cir. 2010) ("In order to draw an inference that the missing documents contained information adverse to the defendants, [plaintiff] must demonstrate that the defendants intentionally destroyed the documents in bad faith."). Applying that same logic here, the district court was correct not to sanction the government, where—even if the FBI constructively possessed the source

code—a foreign sovereign was the reason it could not produce the missing information.[6] *See Lee*, 723 F.3d at 142.

At bottom, the district court was right to focus on the FBI's good faith, and it did not abuse its discretion in denying defendant's motion for Rule 16 sanctions. *See De La Rosa*, 196 F.3d at 715. In any event, and as discussed further below, any error was harmless because defendant has failed to demonstrate that gaining access to the source code would "substantially alter the quantum of proof in his favor," and there is no "appreciable risk that prejudice resulted." *Owens*, 18 F.4th at 936, 940 (citations omitted).

---

[6] Defendant cites *United States v. Risha*, 445 F.3d 298 (3d Cir. 2006), for the proposition that courts recognize the concept of "'cross-jurisdictional constructive' possession." Br. 20. True enough. But in *Risha*, a case involving state and federal agencies, the Third Circuit was clear that the issue of when the state's information may be imputed to federal investigators is "a case-by-case" determination governed by three questions: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *Id.* at 304. In other words, the "joint investigation" label is not outcome determinative. Moreover, in *United States v. Reyeros*, 537 F.3d 270, 282 (3d Cir. 2008), the Third Circuit itself questioned whether the *Risha* test would govern a situation—like here—involving U.S. cooperation with a foreign sovereign. But even if the *Risha* test did apply in the instant case, there was no dispute that the FBI lacked "ready access" to the foreign agencies' evidence, and that the Oceanian Authorities were not acting at FBI's direction or under its "control." So, while in denying defendant's motion for sanctions, the district court assumed without deciding that the FBI constructively possessed the Oceanian Authorities' source code, at least two of the three *Risha* factors would indicate that it did not.

## II.   The District Court Did Not Abuse Its Discretion In Denying Defendant's Motion For Sanctions Based On an Alleged *Brady* Violation.

### A.   Standard of Review

"Upon review of a motion to dismiss which alleges a *Brady* violation, as [defendant] has done here, [this Court] look[s] only to see if the district court abused its discretion." *Cherry*, 920 F.3d at 1140. *Brady* violations implicate both issues of fact and law. *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018). If properly preserved, this Court reviews "the district court's factual findings for clear error, and legal conclusions de novo." *Id.* "The district court abuses its discretion when it makes an error of law or when it makes a clearly erroneous finding of fact." *United States v. Freeman*, 650 F.3d 673, 678-79 (7th Cir. 2011).

But if a defendant raises a *Brady* argument for the first time on appeal, this Court will review it for plain error. *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012). "That means the alleged *Brady* violation must be an obvious error that affected [defendant's] substantial rights and created a substantial risk of convicting an innocent person." *Id.* (citation omitted).

### B.   Analysis

"Under *Brady v. Maryland*, a defendant can obtain a new trial if he shows that evidence suppressed by the government was favorable and material to either his guilt or punishment." *Ballard*, 885 F.3d at 504. A defendant meets

that burden only if the Court determines, "in the context of the entire [trial] record," that "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (citation omitted). *See also Strickler v. Greene*, 527 U.S. 263 (1999) ("strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). Critically, "[m]ere speculation that a government file may contain *Brady* material is not sufficient." *United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992).

The district court did not abuse its discretion in finding that defendant's position was too speculative to demonstrate that the missing source code was material to the question of guilt. Indeed, defendant's motion for sanctions suggested only that it was "*possible* that when a person's computer is infected with malware, other people may be able to store contraband on the computer's drives without the owner's knowledge." App. 22 (emphasis in original). And, as the district court rightly observed, that theory was especially "fanciful" in the present case, because defendant "offer[ed] nothing even remotely suggesting that this might have happened here." App. 22-23. Accordingly, the district court was well within its right to conclude that defendant had failed to carry "his burden to show that the evidence he seeks is exculpatory," "material," or

that it "could have any effect on a jury." *Id.* at 21-23 (citing *Morris*, 957 F.2d at 1403).

Defendant's opening brief does not challenge those conclusions, *see* Br. 28-38, and so he has waived any argument on appeal that the missing source code might exonerate him of possessing child pornography. *Miller v. Chicago Transit Authority*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("arguments not raised in an opening brief are waived"). Instead, defendant faults the court for analyzing his *Brady* claim only in terms of whether the source code he sought could have altered the quantum of proof at trial—that is, for not analyzing the issue through the lens of the Fourth Amendment. *See* Br. 30. But nowhere in defendant's motion for sanctions did he specifically tie his inability to conjure a suppression motion to his *Brady* rights. *See, e.g.*, R. 92 at 1 (vaguely complaining that the missing source code violated Rule 16, *Brady*, and "overall fundamental fairness" without specificity). And, to the contrary, his reply brief identified five distinct rights allegedly offended by the government's failure to produce the source code: one such right was defendant's inability to "mount a meaningful Fourth Amendment challenge," while two *others* identified his Due Process and *Brady* rights. *See* R. 97 at 17. Accordingly, any contention that the district court committed error in failing to consider his *Brady* claim in the context of the Fourth Amendment should be considered forfeited.

That is especially true because this Court has never extended a defendant's *Brady* rights to the suppression context. *See United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016) ("It is an unsettled question whether *Brady* applies to pretrial suppression motions. So far, we have declined to weigh in on this matter."). Rather, it has specifically said that "[t]he *Brady* rule is *not* a rule of pretrial discovery," *Gray*, 648 F.3d at 565 (emphasis added), and that to carry his burden on a *Brady* claim, defendant must show "a 'reasonable probability' that the result would have been different had the suppressed evidence been put *before the jury*," *United States v. Edwards*, 34 F.4th 570, 588 (7th Cir. 2022) (emphasis added).

Contrary to defendant's claim that "most courts addressing the issue" have extended *Brady* to Fourth Amendment challenges, Br. 31, it appears that only two federal courts of appeals have done so. *See Thomas*, 835 F.3d at 734 ("The Fifth and Ninth Circuits have held that it does."). Traditionally, courts have considered *Brady* to be a trial right, which does not attach at the suppression stage. *See Fields v. Wharrie*, 672 F.3d 505, 514 (7th Cir. 2012) ("*Brady* and *Giglio* violations breach a defendant's trial rights"). As the D.C. Circuit has put it in declining to extend the right, "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir.

1999). *See also United States v. Bullock*, 130 F. App'x 706, 723 (6th Cir. 2005) (same); *United States v. Dahl*, 597 F. App'x 489, 491 n.2 (10th Cir. 2015) (same).

Yet nowhere in the briefing below did defendant argue that *Brady* should be extended—for the very first time in this Circuit—to suppression motions. Accordingly, the district court cannot fairly be criticized on appeal for interpreting defendant's *Brady* argument, consistent with prevailing case law, as aimed at his guilt or innocence at a potential trial. Defendant's *Brady* argument, therefore, should be reviewed for plain error. *See United States v. Stott*, 245 F.3d 890, 900 (7th Cir. 2001) ("Because [defendant] did not present [his argument that *Brady* applies to suppression hearings] to the district court, our review is only for plain error."). And because this Court has never extended *Brady* rights to the suppression context, defendant's argument fails under that standard. *Id.* at 902 (the district court did not plainly err in not considering defendant's Brady argument in the suppression context "[b]ecause the law concerning *Brady*'s application to suppression hearings is not 'clear' or 'obvious'").

But even if this Court were to deem the argument preserved, and hold for the first time that *Brady* applies to suppression motions, the district court's failure to consider the issue would be harmless error. Throughout the district court proceedings, defendant repeatedly complained that, without the source

44

code, he was unable to show whether he had a viable Fourth Amendment claim. *See, e.g.*, R. 92 at 11 (calling it "conceivable" that malware was used). He renews that grievance on appeal. *See, e.g.*, Br. 18 ("If his theory proved true, then the technique operated just like the government's NIT malware and conducted a Fourth Amendment search."). Necessarily then, defendant has not demonstrated that the source code was exculpatory or that he was prejudiced by its absence—prerequisites to a meritorious *Brady* argument. *See Olofson*, 563 F.3d at 661 ("there are three parts to a *Brady* violation: 1) the disputed evidence must be favorable to the defendant, either because it is exculpatory or impeaching; 2) that evidence must have been suppressed by the government, either willfully or inadvertently; and 3) prejudice must have occurred"). At most, he has shown that the missing code was *potentially* exculpatory. As outlined in Section I.B. above, this Court thus requires "a showing of Government bad faith . . . to establish a constitutional violation in these circumstances." *Chaparro-Alcantara*, 226 F.3d at 624. Because there was no bad faith, his motion for sanctions was rightly denied.

This Court's recent decision in *Owens* emphasizes why speculative theories of defense cannot sustain a motion for discovery sanctions—whether in the context of *Brady* or Rule 16's more permissive discovery rule. There, this Court rejected a defense argument that he was entitled to the proprietary details of Wisconsin state law enforcement's computer program called

45

Torrential Downpour Receptor ("TDR"), which had been used to identify Owens as a distributor of child pornography on the internet's BitTorrent network. 18 F.4th at 931-32. "To download and share files over the BitTorrent network, a user must first install a BitTorrent software 'client'" on his computer. *Id.* at 931. Once installed, "BitTorrent enable[s] users to download portions of a file from numerous other users simultaneously," such that no single IP address can fairly be said to have distributed a child pornography video to an end user—effectively inoculating distributors from prosecution. *Id.* at 931-32. Law enforcement's proprietary TDR program, however, enabled investigators to override that core BitTorrent feature and cause a single IP address to transmit an entire child pornography video, rather than one small piece of it, to a recipient. *Id.* Investigators used TDR to download an elicit video from Owens's IP address and thereafter obtained a search warrant for his residence. *Id.* at 932. Inside, law enforcement found thousands of child pornography files, but not the video file that they alleged he had distributed via BitTorrent prior to the search—an act of distribution for which he was charged and that carried a five-year mandatory minimum. *Id.* at 933. *See* 18 U.S.C. § 2252(b)(1).

Owens hypothesized that the reason agents never found the elicit BitTorrent video was because he never possessed it (let alone distributed it) in the first place. *Owens*, 18 F.4th at 933. According to Owens's theory, the TDR program employed by the agents could have had a "bug" that errantly

identified his IP address as the one that transmitted the child pornography video the agents downloaded. *Id.* To support the theory, Owens moved to compel production of TDR's source code. *Id.*

In conjunction with his motion, Owens retained an expert who testified that the limited information the government had produced in discovery (*i.e.,* logs detailing TDR's download activity) indicated that the BitTorrent file at issue was downloaded too quickly to have come from a single IP address— undercutting the government's theory that Owens (and Owens alone) transmitted the file. *Owens*, 18 F.4th at 934. The government opposed the motion on the grounds that (1) the source code was not material and (2) even if it was, such information was protected under the "law enforcement investigatory privilege," because exposing TDR's technical details would jeopardize ongoing investigations. *Id.* at 933.

The district court denied Owens's motion because it rested on "mere speculation that TDR could have logged a false positive." *Owens*, 18 F.4th at 935. This Court affirmed, concluding that Owens had fallen short of demonstrating how access to the TDR source code would "substantially alter the quantum of proof in his favor," and thus, that there was no "appreciable risk that prejudice resulted" from the district court's refusal to order its production. *Id.* at 940-41.

47

*Owens* relied on various decisions of its sister Circuits, including *United States v. Hoeffener*, 950 F.3d 1037 (8th Cir. 2020). *Hoeffener*, like *Owens*, involved BitTorrent, the government's TDR program, and a motion for Rule 16 sanctions. *See* 18 F.4th at 939. But unlike in *Owens*—though exactly like in the instant case—Hoeffener surmised that TDR's source code would support a Fourth Amendment argument because it might reveal that the government's technology "could possibly access non-public areas of his computer." *Id.* at 940. Hoeffener argued that the materials he had received in discovery, which (as here) included a depiction of how law enforcement employed its technology—but *not* the underlying source code—left him unable to demonstrate his Fourth Amendment claim, such that the district court should have compelled the code's production. *Id.*

The Eighth Circuit agreed that defendant's speculation fell short of establishing materiality and affirmed the district court's denial of his motion to compel. *Owens*, 18 F.4th at 940. As this Court described the holding of *Hoeffener* and cases like it, even in the context of Rule 16—with its far more defense-friendly standard of materiality than that of *Brady*—a defendant is not entitled to "the government's confidential software . . . if he cannot present a cogent defense theory, supported by some *facts*, which discovery relating to the software would help develop" *Id.* (emphasis added). *See also United States v. Clarke*, 979 F.3d 82, 98 (2d Cir. 2020) (affirming denial of motion to compel

48

TDR source code because defendant's theory that the program could not have downloaded a child pornography file from his computer was "speculation"); *United States v. Chiaradio*, 684 F.3d 265, 277 (1st Cir. 2012) (affirming denial of motion to compel under analogous circumstances because defendant could not demonstrate that lack of source code prejudiced him).

Defendant's claim, too, is premised on an entirely speculative theory of how the Oceanian Authorities' program worked. Defendant surmises that a foreign government might have "searched" his computer when he chose to stream a video they posted. *See* Br. 17. But he presents no actual *facts* in support of that hypothesis. Quite the opposite, the information that was available to the FBI indicated the Oceanian Authorities' technique was "non-invasive." R. 96 at 13 n.6. As set forth above, the information shared with the FBI detailed the affirmative steps that *defendant*—not the Oceanian Authorities—took to open Windows Media Player on his computer to view the illicit content he voluntarily opted to see. R. 92, Ex. B. By clicking "OK" to launch that program, defendant's own actions transmitted his IP address to The Love Zone's server—a standard feature of the internet, in which defendants have no reasonable expectation of privacy. *See Soybel*, 13 F.4th at 594.

Put simply, defendant's hypothesis that law enforcement searched his computer to obtain his IP address is too conjectural to satisfy his burden of

demonstrating materiality. *Morris*, 957 F.2d at 1402 ("Mere speculation that a government file may contain *Brady* material is not sufficient."). Moreover, it depends on a legal theory completely untethered from Fourth Amendment law—that a foreign government must seek a warrant from a U.S. court prior to investigating internet crimes that could implicate American citizens. *See Stokes*, 726 F.3d at 892 ("such warrants would have dubious legal significance, if any, in a foreign nation" and "it is by no means clear that U.S. judicial officers could be authorized to issue warrants for overseas searches"). Therefore, defendant has failed to show that the missing source code would have garnered him a winning suppression argument or otherwise altered the outcome of his criminal case. *Strickler*, 527 U.S. at 281 ("there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict").

The district court was correct in finding no violation of defendant's *Brady* right, and it did not abuse its discretion in denying his motion for sanctions.[7]

---

[7] If the Court were to find that the district court erred in denying defendant's motion for sanctions, the government respectfully requests that the case be remanded for a hearing to determine (1) whether the FBI engaged in a joint investigation with the Oceanian Authorities and, if so, constructively possessed their source code (issues the district court assumed without deciding); (2) even if so, whether the actions of the Oceanian Authorities abroad could support a viable Fourth Amendment claim (an issue the district court did not reach, but which is fundamental to defendant's claim that the missing source code is material under Rule 16 or *Brady*); and (3) what sanction, if any, is appropriate under the circumstances.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the

Court affirm the district court's judgment.


Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

ALEXANDRA MORGAN
Assistant United States Attorney

/s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

## RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 11,618 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:        /s/ *Brian J. Kerwin*
            BRIAN J. KERWIN
            Assistant United States Attorney
            219 South Dearborn Street, 5th Floor
            Chicago, Illinois
            (312) 886-1328

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:    /s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-1328